ZACHARY, Judge.
 

 *4
 
 Petitioner Christine N. Brewington appeals from a Final Decision of the North Carolina Office of Administrative Hearings, which concluded that respondent North Carolina Department of Public Safety (DPS), State Bureau of Investigation (SBI) had just cause to dismiss Brewington from her position as a Special Agent with the SBI. For the reasons that follow, and after careful analysis, we affirm the decision of the administrative law judge.
 

 I. Background
 

 Brewington began working as a Special Agent for the SBI in 1998, and she held that position until her dismissal in June 2015. Prior to her dismissal, Brewington was working in the Diversion and Environmental Crimes Unit. On 3 September 2014, Brewington was assigned to conduct
 
 *5
 
 interviews with several employees of a pharmacy located in Lillington, North Carolina. The assignment required Brewington to work with Elizabeth Collier, an investigator with the North Carolina Pharmacy Board, in connection with a drug diversion case. This was Collier's first case as an investigator with the Pharmacy Board.
 

 After concluding the interviews between 1:45 and 2:00 p.m., Brewington and Collier drove separately to a nearby restaurant called the Sports Zone, where Brewington had dined on prior occasions, for a working lunch. While there, Martha Sullivan waited on Brewington and Collier's table. Sullivan would usually fix Brewington a beverage known as a "Sprite Delight," unless Brewington requested something else to drink. Brewington described the Sprite Delight as a non-alcoholic
 
 *120
 
 beverage, pinkish in color, which contained "cranberry juice ... along with pineapple juice or grapefruit juice." Brewington recalled that she ordered her "usual drink[,]" a Sprite Delight, during her 3 September 2014 lunch with Collier.
 

 According to Collier, Brewington ordered "what appeared to be a cocktail[,]" which was pink and was served in a "stemmed bowl-type glass, goblet style." Brewington drank the beverage as she and Collier ate lunch. Collier also observed that Brewington ordered a second drink at the end of the meal that had the same appearance. Toward the end of the meal, Brewington's friend, Mike Mansfield, arrived at the Sports Zone and joined Brewington and Collier. Brewington recalled that Mansfield ordered a beer immediately after he sat down, but Collier did not observe Mansfield order any food or drinks and indicated that she would have remembered seeing beer on the table. According to Brewington, she did not consume any alcohol during lunch, but "throughout the time that we were there, [Mansfield] continued to order another beer. I do recall him ordering a mixed drink, but I don't know what the mixed drink was."
 

 Shortly after Mansfield's arrival, Collier prepared to leave the restaurant. Because the Pharmacy Board authorized its representatives to pay for meals they shared with members of other state agencies, Collier offered to pay for Brewington's lunch. However, before she paid the bill, Collier informed Brewington that while she could pay for the food, she could not use her Pharmacy Board credit card to pay for alcohol. Brewington did not attempt to argue with or correct Collier's impression that the beverages Brewington had ordered contained alcohol. Collier "made a point to separate [the alcohol] from [her] portion of the bill[,]" paid for one order of loaded potato chips and one order of fish tacos at 3:28 p.m., and then left the restaurant "pretty much right after" paying the bill.
 

 *6
 
 Brewington remained at the restaurant with Mansfield for approximately thirty minutes after Collier's departure. Mansfield had forgotten his wallet, so Brewington offered to "pay for his meal or whatever he had ordered, and he could just pay [her] back at a later date." At 3:57 p.m., Brewington used her personal credit card to pay for one order of loaded potato chips, "3 Coors Light" beers (totaling $9.87), and "2 Special Mixed Drink 7['s]" (totaling $15.98).
 

 Eight months after her 3 September 2014 lunch with Brewington, Collier audited a SBI Diversion School course. After diversion classes had concluded, Collier attended a social dinner with a group of course participants, one of whom was SBI Special Agent Steven
 
 [1]
 
 Smith. During a conversation regarding professionalism, Collier mentioned to Special Agent Smith that she had observed Brewington consume alcohol during their lunch at the Sports Zone. Collier recalled that the incident "just kind of came up in conversation." Special Agent Smith informed Collier that he would have to report the issue of Brewington's alleged misconduct to his supervisor, as the SBI has a strict policy that prohibits the consumption of alcohol by on-duty agents.
 
 [2]
 
 Once Special Agent Smith reported Collier's allegations to his supervisor, the issue worked its way through the SBI's chain of command. Eventually, the Special Agent in Charge of the SBI's Special Investigations Unit, Kanawha Perry, was assigned to investigate the incident.
 

 By letter dated 11 May 2015, Special Agent in Charge Perry notified Brewington that she was the subject of an internal investigation. However, the letter contained an error as to the date of the incident: "The nature of the allegation is as follows: Unacceptable Personal Conduct based on an allegation that in or around
 
 January 2015
 
 you consumed an alcoholic beverage while on duty." (Emphasis added). Special Agent in Charge Perry and Assistant Special Agent in Charge Cecil Cherry interviewed Brewington
 
 *121
 
 on 20 May 2015. Prior to the beginning of the interview, Special Agent in Charge Perry advised Brewington of her
 
 Garrity
 
 rights
 
 [3]
 
 and corrected the date of the alleged offense date
 
 *7
 
 to 3 September 2014. After the date in question was correctly identified, Brewington stated that she did not need extra time to prepare for the interview. Because SBI policy generally prohibits the use of tape recorders during non-custodial interviews, Special Agent in Charge Perry took notes on Brewington's answers and used these notes to generate a typewritten report.
 

 According to Special Agent in Charge Perry's report, Brewington was asked if she took any prescription medications that affected her ability to use a firearm; in response, she identified five medications that she was taking to control various health conditions, and she stated that none of the medicines affected her cognitive abilities or her ability to use a firearm. The agents then proceeded to ask Brewington questions concerning what occurred at the Sports Zone on 3 September 2014. Brewington indicated that she drank two Sprite Delights; that she did not consume any alcohol; that Mansfield arrived near the end of the lunch; that "she [could not] recall what Mansfield had to drink or eat"; that Mansfield "usually gets water"; and that Mansfield " 'rarely' dr[ank] a beer or two and she [could not] recall if he bought a beer that day."
 

 Later in the interview, the agents produced Brewington's 3 September 2014 receipt from the Sports Zone. Brewington confirmed that her credit card was used to pay the bill, and that her signature appeared on the receipt. Brewington also agreed that based on the price of the two mixed drinks (approximately $8.00 apiece), the drinks must have contained alcohol. However, after explaining that Sullivan never charged her for Sprite Delights, Brewington maintained that she had not ordered any alcohol and that it was possible that Mansfield had ordered the two mixed drinks and the three beers listed on the receipt.
 

 At that point in the interview, Assistant Special Agent in Charge Cherry obtained Mansfield's cell phone number from Brewington, went to another room, and called Mansfield. Upon his return to the interview room, Assistant Special Agent in Charge Cherry reported that, according to Mansfield, no alcohol was ordered at the lunch, but if he did consume an alcoholic drink at the Sports Zone, it would have been a beer. After considering Mansfield's statement to Assistant Special Agent in Charge Cherry and noticing certain discrepancies in Brewington's statements, Special Agent in Charge Perry informed Brewington that she would be
 
 *8
 
 required to undergo a polygraph examination. The results of that examination included a determination that Brewington had answered the following question untruthfully: "Did you drink any alcohol at lunch on September 3, 2014? (Answer: 'No')[.]" The polygraph report also contained statements that Brewington made during a post-examination interview:
 

 [Special Agent] Brewington was interviewed post examination by [Assistant Special Agent in Charge] Smith. [Special Agent] Brewington stated that her memory was affected by some of her medical conditions. She further stated that she possibly could have consumed a sip of alcohol from her companion's drink and she could not remember. After thinking about the incident further, [Special Agent] Brewington stated she was "sure" she did not consume any alcohol at lunch on that particular date and time.
 

 By letter dated 3 June 2015, the SBI notified Brewington that she was required to attend a pre-disciplinary conference with SBI Special Agent in Charge W. Ty Sawyer. The specific allegations to be discussed were that Brewington had consumed alcohol while on official duty and had been untruthful during
 
 *122
 
 the internal investigation. Among the conference's purposes were to allow Brewington to present facts that would counter the allegations or support her case and to respond with any information that was relevant to the question of whether disciplinary action, up to and including dismissal, was proper. The pre-disciplinary Conference was held on 10 June 2015. The next day, the SBI issued a letter informing Brewington of "Management's decision ... to dismiss [her] effective June 11, 2015, based on Unacceptable Personal Conduct." The dismissal decision was based upon Brewington's consumption of alcoholic beverages while on duty, and her untruthfulness during the internal investigation process.
 

 After receiving the dismissal letter, Brewington appealed the SBI's decision to the DPS's Employment Advisory Committee (EAC). As part of the grievance process, Brewington submitted two "Employee/Witness" forms requesting that Sullivan and Mansfield be permitted to appear as voluntary witnesses at the EAC Hearing. This request was denied. On 25 August 2015, the EAC heard Brewington's appeal, and considered the internal investigation file, the polygraph examination report, and other statements and evidence that Brewington presented on her own behalf. The EAC also considered the statements that Sullivan and Mansfield gave to the SBI. In a memorandum dated 7 September 2015, the EAC "found that [while] the dismissal letter specified that Ms. Brewington was dismissed for consuming alcohol, ... the evidence presented during
 
 *9
 
 the hearing indicated that she purchased alcohol on duty." The EAC concluded that this distinction was significant. Although the EAC recognized that "both purchasing and consuming alcohol on duty ... constituted Unacceptable Personal Conduct[,]" it ultimately recommended that Brewington's dismissal be overturned.
 

 Once EAC's memorandum was issued, the SBI's Deputy Director, Janie Sutton, was charged with issuing a final recommendation to SBI Director B.W. Collier concerning Brewington's dismissal. In carrying out this responsibility, Deputy Director Sutton considered the internal investigation file, spoke with Special Agent in Charge Perry and his staff, consulted with the SBI's legal counsel, and reviewed the EAC's memorandum. Deputy Director Sutton also spoke with Brewington's immediate supervisor and reviewed the portion of Brewington's personnel file that pertained to three previous disciplinary actions. Brewington had been given written warnings for "Unsatisfactory Job Performance" in August 2013 and September 2014, respectively, for failing to "properly store and secure evidence" that was under her control and for failing to "complete criminal investigative reports and case assignments in a timely manner." On 4 March 2015, Brewington was demoted from the position of "Agent III to Agent II" for,
 
 inter alia
 
 , failure to comply with certain North Carolina criminal discovery statutes (by neglecting to turn over certain discoverable materials to the appropriate District Attorneys' Offices in several cases) and for a continuing failure to timely complete investigative reports and activities. After completing her independent inquiry into the matter and conferring with Director Collier, Deputy Director Sutton recommended that Brewington's dismissal be upheld.
 

 On 28 September 2015, Director Collier issued the SBI's final agency decision, which upheld Brewington's dismissal. Director Collier's decision was based upon the following rationale:
 

 The facts indicate that you not only violated SBI policy and procedure by consuming alcoholic beverages during the work day; but you were not truthful during the internal investigation process, which is also a violation of SBI policy and procedure. Each of the offenses standing alone is just cause for your dismissal for [unacceptable] personal conduct, especially in light of your disciplinary history. You could just as well be dismissed for unsatisfactory job performance....
 

 Given the fact that you have been given multiple opportunities to conform your performance and conduct to the expected norms of this organization, and you have failed to
 
 *10
 
 do so, I do not believe that another demotion or even a suspension or written warning will serve any additional purpose.
 

 *123
 
 On 21 October 2015, Brewington filed a petition for a contested case hearing in the OAH. The case was heard on 11 and 12 January 2016 before Senior Administrative Law Judge (ALJ) Fred G. Morrison, Jr. In a Final Decision entered 29 March 2016, ALJ Morrison made the following pertinent findings of fact:
 

 14. Collier recalled a man arriving toward the end of her lunch with Petitioner, who stayed at the table briefly but he did not sit down or order food and drinks. Collier left shortly after the man arrived. Collier's recollection of her interaction with this man is consistent with Petitioner's oral statements to Special Agent in Charge Kanawha Perry (SAC Perry) made during her May 20, 2015, investigative interview that her friend Michael Mansfield arrived near the end of Collier's and her lunch after Collier and she had already eaten their lunch and that "Mansfield met Collier just before she left."
 

 15. Collier did not remember seeing the man order mixed drinks or drink beer, or there being any beer on the table during her time at lunch. She only recalls seeing the two mixed drinks ordered by Petitioner while they ate lunch together. Collier opined that had the man sat down and ordered and consumed beer she would have remembered it. Collier's testimony in this regard is credible.
 

 ...
 

 22. Petitioner's testimony that Mansfield arrived at the restaurant "around three o'clock, if not a little before" ...; that Mansfield came in about midway through her meal with Collier and sat down while they finished their meal...; and that Mansfield ordered a beer as soon as he sat down and then "continued to order another beer" while Petitioner and Collier were finishing their meal ... is not credible in that it conflicts with the statements made by Petitioner to SAC Perry listed in Finding of Fact 14 and with Collier's testimony listed in Findings of Fact 14 and 15. Collier's testimony is more credible.
 

 23. Petitioner's testimony that her friend Mike Mansfield ordered and consumed all of the alcoholic beverages listed
 
 *11
 
 on the Sports Zone receipt that she paid with her debit card is not credible, in that it is not reasonable to believe that Mansfield ordered and/or consumed three beers and two mixed alcoholic drinks in the approximate 30 minute time period between 3:28 p.m. when Collier paid her bill and left the restaurant, and 3:57 p.m. when Petitioner paid her bill.
 

 24. It is more likely than not that Mansfield ordered and drank the three beers while Petitioner drank her second mixed drink after Collier left the restaurant....
 

 28. It is more likely than not that Petitioner drank alcoholic beverages while armed and on official duty on September 3, 2014, and made untrue statements to SBI agents during the course of her investigative interview on May 20, 2015....
 

 31. Based on all of the information that she reviewed, Sutton recommended to Director Collier that Petitioner be dismissed. Director Collier adopted that recommendation and designated authority to Sutton to sign the agency's final agency decision dismissing her. She was dismissed from the SBI for unacceptable personal conduct for consuming alcohol while on duty and being untruthful when questioned about the matter during the internal investigation....
 

 32. Sutton, on behalf of the SBI, considered the seriousness of the offenses and Petitioner's disciplinary history which included multiple written warnings (for unsatisfactory work performance) and a recent demotion (for unacceptable personal conduct and unsatisfactory job performance) in determining the appropriate sanction for Petitioner's unacceptable personal conduct. Based on these considerations, Sutton determined that Petitioner's conduct warranted dismissal and she continued to hold that position on behalf of the SBI at hearing.
 

 Based on these and other findings, ALJ Morrison concluded that "substantial evidence" presented at the hearing established that Brewington "consumed an alcoholic beverage during her September 3, 2014 lunch" with Collier, and that Brewington "made untrue statements to SBI agents during her investigative interview on May 20, 2015[.]" ALJ
 

 *124
 
 Morrison then concluded that DPS had shown by the preponderance of the
 
 *12
 
 evidence that it had just cause to terminate Brewington for unacceptable personal conduct.
 

 Brewington now appeals from ALJ Morrison's Final Decision.
 

 II. Standard of Review
 

 Section 150B-51 of our State's Administrative Procedure Act (APA) establishes the scope and standard of review that we apply to the final decision of an administrative agency.
 
 Harris v. N.C. Dep't of Pub. Safety
 
 , --- N.C.App. ----, ----,
 
 798 S.E.2d 127
 
 , 133 (2017). The APA authorizes this Court to affirm or remand an ALJ's final decision, N.C. Gen. Stat. § 150B-51(b) (2015), but such a decision may be reversed or modified only
 

 if the substantial rights of the petitioners may have been prejudiced because the findings, inferences, conclusions, or decisions are:
 

 (1) In violation of constitutional provisions;
 

 (2) In excess of the statutory authority or jurisdiction of the agency or [ALJ];
 

 (3) Made upon unlawful procedure;
 

 (4) Affected by other error of law;
 

 (5) Unsupported by substantial evidence admissible under G.S. 150B-29(a), 150B-30, or 150B-31 in view of the entire record as submitted; or
 

 (6) Arbitrary, capricious, or an abuse of discretion.
 

 Id.
 

 The particular standard applied to issues on appeal depends upon the nature of the error asserted. "It is well settled that in cases appealed from administrative tribunals, questions of law receive
 
 de novo
 
 review, whereas fact-intensive issues such as sufficiency of the evidence to support an agency's decision are reviewed under the whole-record test."
 
 N. Carolina Dep't of Env't & Nat. Res. v. Carroll
 
 ,
 
 358 N.C. 649
 
 , 659,
 
 599 S.E.2d 888
 
 , 894 (2004) (brackets, quotation marks and citation omitted).
 

 To that end, we review
 
 de novo
 
 errors asserted under subsections 150B-51(b)(1)-(4). N.C. Gen. Stat. § 150B-51(c) (2015). Under the
 
 de novo
 
 standard of review, the reviewing court "considers the matter anew and freely substitutes its own judgment[.]"
 
 Carroll
 
 ,
 
 358 N.C. at 660
 
 ,
 
 599 S.E.2d at 895
 
 (citation, internal quotation marks, and brackets omitted).
 

 *13
 
 When the error asserted falls within subsections 150B-51(b)(5) and (6), this Court must apply the "whole record standard of review." N.C. Gen. Stat. § 150B-51(c) (2015). Under the whole record test,
 

 [the reviewing court] may not substitute its judgment for the agency's as between two conflicting views, even though it could reasonably have reached a different result had it reviewed the matter
 
 de novo
 
 . Rather, a court must examine all the record evidence-that which detracts from the agency's findings and conclusions as well as that which tends to support them-to determine whether there is substantial evidence to justify the agency's decision.
 

 Carroll
 
 ,
 
 358 N.C. at 660
 
 ,
 
 599 S.E.2d at 895
 
 (internal citations and quotation marks omitted). " 'Substantial evidence' means relevant evidence a reasonable mind might accept as adequate to support a conclusion." N.C. Gen. Stat. § 150B-2(8c) (2015).
 

 "In a contested case under the APA, as in a legal proceeding initiated in District or Superior Court, there is but one fact-finding hearing of record when witness demeanor may be directly observed."
 
 Carroll
 
 ,
 
 358 N.C. at 662
 
 ,
 
 599 S.E.2d at 896
 
 (citation and internal quotation marks omitted). It is also well established that
 

 [i]n an administrative proceeding, it is the prerogative and duty of [the ALJ], once all the evidence has been presented and considered, to determine the weight and sufficiency of the evidence and the credibility of the witnesses, to draw inferences from the facts, and to appraise conflicting and circumstantial evidence. The credibility of witnesses and the probative value of particular testimony are for the [ALJ] to determine, and [the ALJ] may accept or reject in whole or part the testimony of any witness.
 

 City of Rockingham v. N.C. Dep't of Envt. & Natural Res., Div. of Water Quality
 
 ,
 
 224 N.C.App. 228
 
 , 239,
 
 736 S.E.2d 764
 
 , 771 (2012). Our review, therefore, must be undertaken
 
 *125
 
 "with a high degree of deference" as to " '[t]he credibility of witnesses and the probative value of particular testimony[.]' "
 
 N.C. Dep't of Pub. Safety v. Ledford
 
 , --- N.C.App. ----, ----,
 
 786 S.E.2d 50
 
 , 64 (2016) (citation omitted),
 
 review allowed
 
 ,
 
 369 N.C. 40
 
 ,
 
 792 S.E.2d 152
 
 (2016). As our Supreme Court has explained, "the ALJ who conducts a contested case hearing possesses those institutional advantages that make it appropriate for a reviewing court to defer to his or her findings of fact."
 
 Carroll
 
 ,
 
 358 N.C. at 662
 
 ,
 
 599 S.E.2d at 896
 
 (internal citation and quotation marks omitted).
 
 *14
 

 III. Just Cause
 

 Brewington's overarching argument on appeal is that ALJ Morrison erred in concluding that DPS had just cause to dismiss Brewington from employment. However, Brewington's attack on DPS's just cause determination, and on ALJ Morrison's consideration of it, takes many different forms. As such, we begin with an explanation of North Carolina's essential just cause principles.
 

 Brewington was a career State employee subject to the North Carolina Human Resources Act. Our legislature has determined that "[n]o career State employee subject to the ... Act shall be discharged, suspended, or demoted for disciplinary reasons, except for just cause."
 
 N.C. Gen. Stat. § 126-35
 
 (a) (2015). Under the North Carolina Administrative Code, "just cause" for the disciplinary action taken may be established upon a showing of an employee's "unacceptable personal conduct." 25 NCAC 1J.0604(b)(2) (2016). Unacceptable personal conduct is defined, in pertinent part, as
 

 (a) conduct for which no reasonable person should expect to receive prior warning;
 

 ...
 

 (d) the willful violation of known or written work rules; [or]
 

 (e) conduct unbecoming a state employee that is detrimental to state service[.]
 

 25 NCAC 1J.0614(8) (2016).
 

 "Just cause, like justice itself, is not susceptible of precise definition."
 
 Carroll
 
 ,
 
 358 N.C. at 669
 
 ,
 
 599 S.E.2d at 900
 
 (citations and quotation marks omitted). Properly understood, just cause is a "flexible concept, embodying notions of equity and fairness, that can only be determined upon an examination of the facts and circumstances of each individual case."
 

 Id.
 

 (citation and quotation marks omitted). "Inevitably, this inquiry requires an irreducible act of judgment that cannot always be satisfied by the mechanical application of rules and regulations."
 

 Id.
 

 In
 
 Carroll
 
 , our Supreme Court declared that every determination of whether a public employer's decision to discipline its employee was supported by just cause "requires two separate inquiries: first, whether the employee engaged in the conduct the employer alleges, and second, whether that conduct constitutes just cause for the disciplinary action taken."
 
 Id.
 
 at 665,
 
 599 S.E.2d at 898
 
 (citation, quotation marks, and
 
 *15
 
 brackets omitted). "[T]he first of these inquiries is a question of fact ... [and is] reviewed under the whole record test.... [T]he latter inquiry is a question of law ... [and] is reviewed
 
 de novo
 
 ."
 
 Id.
 
 at 665-66,
 
 599 S.E.2d at 898
 
 .
 

 This Court has addressed "the subject of commensurate discipline" in the context of unacceptable personal conduct and the just cause framework.
 
 Warren v. N. Carolina Dep't of Crime Control & Pub. Safety
 
 ,
 
 221 N.C.App. 376
 
 , 379,
 
 726 S.E.2d 920
 
 , 923 (2012). After examining the flexible just cause standard enunciated in
 
 Carroll
 
 , the
 
 Warren
 
 Court determined that "not every instance of unacceptable personal conduct as defined by the Administrative Code provides just cause for discipline."
 
 Id.
 
 at 382,
 
 726 S.E.2d at 925
 
 . The
 
 Warren
 
 Court then articulated a three-pronged approach to determine whether just cause exists to discipline an employee who has engaged in unacceptable personal conduct:
 

 We conclude that the best way to accommodate the Supreme Court's flexibility and fairness requirements for just cause is to balance the equities after the unacceptable personal conduct analysis. This avoids contorting the language of the Administrative Code defining unacceptable personal conduct. The proper analytical approach is to first determine whether the employee engaged in the conduct the employer alleges. The second inquiry is whether the
 
 *126
 
 employee's conduct falls within one of the categories of unacceptable personal conduct provided by the Administrative Code. Unacceptable personal conduct does not necessarily establish just cause for all types of discipline. If the employee's act qualifies as a type of unacceptable conduct, the tribunal proceeds to the third inquiry: whether that misconduct amounted to just cause for the disciplinary action taken.
 

 Id.
 
 at 382-83,
 
 726 S.E.2d at 925
 
 .
 

 IV. Discussion
 

 A.
 
 Substantial Evidence to Support Just Cause Determination (Whole Record Test)
 

 In her first challenge to ALJ Morrison's Final Decision, Brewington makes a series of arguments to support one principal assertion: that substantial evidence did not exist to justify her termination. We address each of Brewington's arguments in turn.
 

 *16
 

 1.
 
 Brewington's Motion to Dismiss
 

 Brewington contends that ALJ Morrison erred when he denied Brewington's motion to dismiss at the close of DPS's evidence. This argument is based upon a single sentence taken from ALJ Morrison's comments on DPS's opposition to Brewington's motion: "I'm not entirely convinced you've shown just cause for her termination...."
 

 In focusing on this one sentence, Brewington fails to provide crucial context. The relevant exchange was as follows:
 

 Mr. McGuinness: The Petitioner would respectfully move to dismiss the case against her at this juncture, Your Honor.... Our position is simple. The totality of the evidence and the light most favorable to the Respondent does not establish just cause as a matter of law. Thank you.
 

 The Court: Do you want to comment on it?
 

 Ms. Strickland: I just want to state, Judge, I believe at this stage that we have shown just cause and the light most favorable to the Respondent's evidence and ask that you deny that motion.
 

 The Court: Well, you haven't gone-you know, I'm not entirely convinced you've shown just cause for her termination, so therefore, you know, I want to hear from the Petitioner, really. I think in a case like this I deserve to. I'm having to hear this case and I'm not a polygraph or anything like that. You weigh the evidence and determine credibility you've been talking about.
 

 And there-you know, I just deny your motion, and we'll take about 10 minutes.
 

 A careful review of ALJ Morrison's brief ruling on Brewington's motion to dismiss reveals a measured approach. ALJ Morrison was not
 
 entirely
 
 convinced that DPS had shown just cause. Consequently, ALJ Morrison expressed to the parties that due to the nature of the case, Brewington's side of the story would be crucial to the credibility determinations he would invariably have to make. Given this context, we conclude that ALJ Morrison properly denied Brewington's motion to dismiss.
 

 2. Challenges to ALJ Morrison's Findings of Fact
 

 Brewington next argues that the following findings of fact contained in ALJ Morrison's Final Decision were not supported by substantial
 
 *17
 
 evidence: 11, 14, 15, 22, 23, 24, 28, 31, 32. Brewington also maintains that findings 23 and 24 contain speculation.
 

 We first note that the majority of ALJ Morrison's findings are not challenged and therefore are conclusively established on appeal.
 
 Koufman v. Koufman
 
 ,
 
 330 N.C. 93
 
 , 97,
 
 408 S.E.2d 729
 
 , 731 (1991) ("Where no exception is taken to a finding of fact by the trial court, the finding is presumed to be supported by competent evidence and is binding on appeal.") (citation omitted). In addition, because finding of fact 11 is the only finding that Brewington challenges with a specific argument, issues concerning the remaining challenged findings have been abandoned. N.C. R. App. P. 28(b)(6) (2015).
 

 Finding of fact 11 reads as follows:
 

 During the lunch, Petitioner ordered two Special Mixed Drinks which contained alcohol. They were pink in color mixed drinks which were served in a "stemmed bowl-type glass-goblet style." Petitioner
 
 *127
 
 drank one of the drinks while eating lunch with Collier and ordered the second one prior to Collier leaving the restaurant.
 

 Brewington cites Sullivan's statement to the SBI, in which Sullivan stated "she had never served SA Brewington an alcoholic beverage." This quotation was contained in Brewington's Exhibits 1 (the EAC Report) and 14 (the SBI's summary of Sullivan's statement), both of which were offered into evidence before ALJ Morrison. Brewington then asserts that her "evidence on this point was direct and corroborated by two eye witnesses." We presume that the "two eyewitnesses" to whom Brewington refers are Sullivan and Mansfield. The EAC Report contained an excerpt of Mansfield's telephonic statement to the SBI, in which Mansfield indicated that no alcohol was ordered on 3 September 2014; that he did not remember consuming alcohol that day because he rarely did so; and that if he did consume alcohol, it would have been one beer. After citing this evidence, Brewington asserts that "DPS's evidence on [her alleged consumption of alcohol] is assumption, speculation, and inference, which is irrational to accept when nothing has disproved the direct evidence."
 

 As an initial matter, we recognize a significant flaw in Brewington's argument: Exhibit 1 was only before ALJ Morrison in a limited capacity, and ALJ Morrison granted DPS's motion to exclude Exhibit 14 from evidence. When DPS objected to Exhibit 1 and moved to redact "hearsay statements"-presumably those of Sullivan and Mansfield-contained in the EAC Report, ALJ Morrison noted that he would "not find any facts based on [the report,]" and he overruled the objection. ALJ Morrison then
 
 *18
 
 clarified that he would consider Exhibit 1 "for the fact that [Brewington] went through the grievance procedure and she appealed [to] the [EAC], but then it went to the Director of the SBI, and the Director of the SBI issued [inaudible]."
 

 As to Exhibit 14, DPS argued that Sullivan's statement to the SBI should be excluded because she had not testified at the OAH hearing, and because her statement contained inadmissible hearsay.
 
 [4]
 
 ALJ Morrison excluded the exhibit from evidence, but he did not address the issue of hearsay in his ruling. Rather, ALJ Morrison explained that he would not allow Exhibit 14 into evidence because:
 

 What ... concerns me about that is that-the paragraphs-she didn't remember if she served alcohol to Brewington, Liz, or Mike that day, but she said if alcohol was served, then Mike would have been the one drinking the alcohol that day.
 

 And that's-I mean-and plus if she was waiting on them, she's the one that gave them the ticket, the check, and took the credit card, you assume, and charged them for three beers and two mixed drinks. So I'm not going to allow that one in.
 
 [T p 315]
 

 Thus, ALJ Morrison determined that Sullivan's statement was inconsistent and not credible.
 

 Our review of ALJ Morrison's rulings on Exhibit 1 and Exhibit 14 reveals that his consideration, if any, of portions of Sullivan's and Mansfield's statements (as set forth in Exhibit 1) was extremely limited, and that he did not consider Sullivan's full statement (as set forth in Exhibit 14) at all. Because Brewington does not specifically challenge these rulings,
 
 [5]
 
 any issues related to those exhibits are abandoned. N.C. R. App. P. 28(b)(6). Therefore, Brewington's reliance on the aforementioned exhibits in challenging finding of fact 11 is misplaced.
 

 *19
 
 We now turn to the merits of Brewington's challenge to ALJ Morrison's findings. Brewington specifically takes issue with the portion of finding of fact 11 stating that she "ordered two Special Mixed drinks which
 
 *128
 
 contained alcohol" and then consumed them. The core of Brewington's argument, however, is that any finding that she consumed alcohol during lunch on 3 September 2014 is speculative at best and unsupported by substantial evidence. In other words, no evidence before ALJ Morrison
 
 proved
 
 that Brewington consumed alcohol. It bears repeating that " '[s]ubstantial evidence' means relevant evidence a reasonable mind might accept as adequate to support a conclusion." N.C. Gen. Stat. § 150B-2(8c). Thus, we are not required to determine whether the evidence proved that Brewington consumed alcohol, but whether it adequately supported ALJ Morrison's inference in this regard. This is a critical distinction. It also appropriate to note that "the 'whole record' test is not a tool of judicial intrusion; instead, it merely gives a reviewing court the capability to determine whether an administrative decision has a rational basis in the evidence."
 
 Carroll
 
 ,
 
 358 N.C. at 674
 
 ,
 
 599 S.E.2d at 903
 
 (citation and quotation marks omitted). With these principles in mind, we conclude that the following constitutes substantial evidence in support of finding of fact 11.
 

 Assistant Special Agent in Charge Cherry interviewed Collier on three occasions regarding her recollection of what occurred at the Sports Zone on 3 September 2014. According to the written summaries of those interviews, Collier observed Brewington order two " 'girly' fruity" cocktail-style drinks during lunch. The drinks, pinkish in color, were served in "goblet stemware glass[es]." Based on the drink's appearance, Collier assumed that it was an alcoholic beverage. Consequently, after reviewing the lunch bill, Collier informed Brewington that she would pay for the food but that her Pharmacy Board credit card could not be used to purchase alcohol. Brewington did not indicate that the drinks she had ordered were non-alcoholic. As Collier prepared to leave, a "white male" (Mansfield) arrived at the Sports Zone and sat down with Brewington. Collier's testimony at the OAH hearing was materially consistent with the account that she gave to Assistant Special Agent in Charge Cherry.
 

 According to the written summary of Brewington's interview with SBI investigators, she: drank a Sprite Delight but did not consume any alcohol; indicated that "Mansfield met Collier just before she left"; doubted that she paid for anything that Mansfield ate or drank; stated that Mansfield "rarely" drank a beer or two; and did not recall if Collier had paid for the lunch. However, after she was shown her 3 September 2014 receipt from the Sports Zone, Brewington agreed that
 
 *20
 
 her credit card was used to pay for two mixed drinks and three beers, though she maintained that she did not review her bill before leaving the Sports Zone.
 

 In contrast, at the OAH hearing, Brewington testified that Mansfield arrived sometime in the middle of her meal with Collier, and that Mansfield ordered a beer when he sat down and ordered another beer during the meal. Brewington also recalled that Mansfield ordered some kind of mixed drink. Collier testified, however, that she did not recall any beer on the table, and if there had been, she would have remembered seeing it.
 

 In assessing all of this record evidence, ALJ Morrison noted the inconsistencies between Brewington's interview and her testimony. ALJ Morrison also found Collier's testimony regarding the timing of Mansfield's arrival and whether Mansfield ordered any alcohol before Collier's departure to be more credible. Based on this assessment, ALJ Morrison found in finding of fact 23 that Brewington's testimony that Mansfield
 

 ordered and consumed all of the alcoholic beverages listed on the Sports Zone receipt ... is not credible, in that it is not reasonable to believe that Mansfield ordered and/or consumed three beers and two mixed alcoholic drinks in the approximate 30 minute time period between 3:28 p.m. when Collier paid her bill and left the restaurant, and 3:57 p.m. when Petitioner paid her bill.
 

 After carefully reviewing the record and the Final Decision, we conclude that finding of fact 11 as well as other findings stating that Brewington consumed alcohol during her lunch with Collier are supported by substantial evidence. Although evidence on the issue of Brewington's alcohol consumption
 
 *129
 
 was conflicting, it was for ALJ Morrison to resolve those conflicts, weigh the evidence, assess witness credibility, and draw inferences from the facts.
 
 Carroll
 
 ,
 
 358 N.C. at 674
 
 ,
 
 599 S.E.2d at 904
 
 . ALJ Morrison's resolution of the material conflicts in the evidence has a rational basis in the evidence presented, and we reject Brewington's argument to the contrary.
 

 3. Conclusion of Law No. 8
 

 Brewington also challenges conclusion of law no. 8 in ALJ Morrison's Final Decision, which states: "The following, per G.S. 150B-2(8c), constitutes substantial evidence ... that Petitioner consumed an alcoholic beverage during her September 14, 2014, lunch[.]" According to
 
 *21
 
 Brewington, the nine subparagraphs listed in support of this conclusion are irrelevant, speculative, or favorable to Brewington.
 

 After a careful review of Brewington's contentions, we conclude that it is unnecessary for us to address her individual attacks on each subparagraph listed in support of conclusion of law no. 8. Some of the subparagraphs were not material to the conclusion that Brewington consumed alcohol on 14 September 2014. In addition, the subparagraphs that are material to this conclusion are restatements of findings that ALJ Morrison made in the "Findings of Fact" section of the Final Decision. None of those findings have been successfully challenged, and ALJ Morrison's findings support the conclusion that Brewington consumed alcohol while on duty. As such, we reject her argument.
 

 B.
 
 Brewington's Integrity Evidence (Whole Record Test)
 

 Brewington next argues that ALJ Morrison failed to consider "substantial testimony from seven witnesses and dozens of pages of exhibits" concerning her reputation for honesty and integrity. Beyond that, Brewington simply summarizes portions of testimony given by her character witnesses. This argument is without merit.
 

 In the preamble to his Final Decision, ALJ Morrison specifically stated that:
 

 In making the FINDINGS OF FACT, the undersigned Senior Administrative Law Judge has weighed all the evidence and has assessed the credibility of the witnesses by taking into account the appropriate factors for judging credibility, including, but not limited to the demeanor of the witness, any interests, bias, or prejudice the witness may have, the opportunity of the witness to see, hear, know or remember the facts or occurrences about which the witness testified, whether the testimony of the witness is reasonable, and whether the testimony is consistent with all other believable evidence in the case.
 

 Finding of fact 2 states, in part, that "[d]uring her career [Brewington] received very favorable performance ratings in the area of Integrity ... and five character witnesses testified concerning her reputation for honesty." The rest of finding of fact 2 acknowledges that Brewington "received several written warnings for inadequate job performance and unacceptable personal conduct[,]" and that she was demoted in March 2015. ALJ Morrison's findings then addressed the material issues in the case: whether Brewington consumed alcohol on 3 September 2014 and
 
 *22
 
 whether she was forthright with SBI agents during the internal investigation interview on 20 May 2015. Testimony from the character witnesses was relevant to these issues. But the probative value of the character testimony, if any, was for ALJ Morrison to determine, and he had the prerogative to "accept or reject [that evidence] in whole or part[.]"
 
 City of Rockingham
 
 ,
 
 224 N.C.App. at 239
 
 ,
 
 736 S.E.2d at 771
 
 .
 

 Furthermore, the gravamen of Brewington's argument, as we understand it, is that ALJ Morrison did not consider this evidence. Yet the portions of the Final Decision cited above reveal that the character evidence
 
 was
 
 considered, though not to the extent (or to the positive effect) that Brewington would have preferred. ALJ Morrison assessed the credibility of the witnesses and considered evidence that bolstered as well as detracted from Brewington's reputation for honesty and integrity. In addition, ALJ Morrison noted at the OAH hearing that none of Brewington's character witnesses had any knowledge concerning the events of 3 September 2014. We cannot say that ALJ Morrison's findings
 
 *130
 
 concerning Brewington's character evidence were legally deficient.
 
 [6]
 
 Even assuming that ALJ Morrison should have made more extensive findings on this evidence, it would not require reversal of the Final Decision.
 
 *23
 

 C.
 
 Incomplete Fact Finding (Whole Record Test)
 

 Brewington next argues that ALJ Morrison failed to make sufficiently detailed findings of fact on all of the relevant issues before him. The centerpiece of Brewington's argument is a list of nine "areas of fact"-unsupported by specific arguments-"where there was significant evidence before the Court in Brewington's favor but where ... ALJ [Morrison] made no findings[,]" including "[t]he admitted incompleteness of the [SBI's internal] investigation[, t]he admitted spoliation of evidence by the failure to record all evidence[,] ... [t]he failure to consider the totality of all evidence[,] ... [t]he failure to consider the admitted arbitrariness in [DPS's] investigation[,] ... [and t]he failure to allow the statement of Martha Sullivan in the internal affairs file into evidence." In another section of Brewington's brief, she makes a similar argument, asserting that the findings of fact "in numerous areas lacked sufficient detail, were erroneous and [were] not predicated upon substantial evidence."
 

 We reject these contentions for several reasons. To begin, the essence of this argument is simply that ALJ Morrison should have made more findings and drawn more inferences in Brewington's favor. Brewington also fails to explain how and when the SBI acknowledged deficiencies in or the arbitrariness of its investigation. Instead, Brewington cites the proposed Final Decision that her counsel submitted to ALJ Morrison following the contested case hearing. The proposed decision necessarily contains Brewington's
 
 own
 
 view of the record, and ALJ Morrison was not obligated to find facts based on it. Finally, this Court has recognized that administrative agencies and ALJs "need not make findings as to every fact which arises from the evidence and need only find those facts which are material to the settlement of the dispute."
 
 Craven Reg'l Med. Auth. v. N. Carolina Dep't of Health & Human Servs.
 
 ,
 
 176 N.C.App. 46
 
 , 60,
 
 625 S.E.2d 837
 
 , 845 (2006) ;
 
 see
 

 Collins v. N. Carolina Dep't of Health & Human Servs.
 
 ,
 
 179 N.C.App. 652
 
 ,
 
 634 S.E.2d 641
 
 (2006) (observing that an ALJ "is not required ... to find facts as to all credible evidence" because "[t]hat requirement would place an unreasonable burden on the [ALJ,]" and that, instead, the ALJ "must find those facts which are necessary to support its conclusions of law").
 

 D.
 
 Just Cause Factors Contained in the State Personnel Manual (
 
 De Novo
 
 )
 

 Brewington's next argument is that ALJ Morrison was required to make findings on each and every just cause factor set forth in Section 7 of the North Carolina Personnel Manual. According to Brewington,
 
 *24
 
 our Supreme
 
 *131
 
 Court "embraced this approach" in
 
 Wetherington v. N. Carolina Dep't of Pub. Safety
 
 ,
 
 368 N.C. 583
 
 ,
 
 780 S.E.2d 543
 
 (2015).
 

 In
 
 Wetherington
 
 , a trooper with the North Carolina State Highway Patrol was dismissed for allegedly violating the agency's truthfulness policy.
 

 Id.
 

 at 584
 
 ,
 
 780 S.E.2d at 544
 
 . Critically, the trooper's commanding officer testified "at the OAH hearing ... that he decided to dismiss petitioner not based upon consideration of the facts and circumstances of petitioner's conduct, but instead because of his erroneous view that any violation of the [Highway] Patrol's truthfulness policy must result in dismissal."
 

 Id.
 

 at 592
 
 ,
 
 780 S.E.2d at 547-48
 
 . In other words, the superior officer felt that he had no discretion in determining what sanction to impose for a violation of the agency's truthfulness policy, "apparently regardless of factors such as the severity of the violation, the subject matter involved, the resulting harm, the trooper's work history, or discipline imposed in other cases involving similar violations."
 

 Id.
 

 at 592
 
 ,
 
 780 S.E.2d at 548
 
 . The
 
 Wetherington
 
 Court, however, "emphasize[d] that consideration of these factors is an appropriate and necessary component of a decision to impose discipline upon a career State employee for unacceptable personal conduct[,]" and held that the trooper's termination was made under a misapprehension of the law:
 

 The approach employed by Colonel Glover in applying a fixed punishment of dismissal for any violation is antithetical to the flexible and equitable standard described in
 
 Carroll
 
 and is at odds with both the ALJ's and the SPC's finding of fact that Colonel Glover exercised discretion in reaching his decision to dismiss petitioner.
 

 Application of an inflexible standard deprives management of discretion. While dismissal may be a reasonable course of action for dishonest conduct, the better practice, in keeping with the mandates of both Chapter 126 and our precedents, would be to allow for a range of disciplinary actions in response to an individual act of untruthfulness, rather than the categorical approach employed by management in this case.
 

 As such, by upholding respondent's use of a per se rule of mandatory dismissal for all violations of a particular policy, the SPC failed to examine the facts and circumstances of petitioner's individual case as required by this state's jurisprudence.
 

 Id.
 

 at 592-93
 
 ,
 
 780 S.E.2d at 548
 
 .
 

 *25
 
 Although the primary holding in
 
 Wetherington
 
 was that public agency decision-makers must use discretion in determining what disciplinary action to impose in situations involving alleged unacceptable personal conduct, the Court did identify factors that are "appropriate and necessary component[s]" of that discretionary exercise.
 

 Id.
 

 at 593
 
 ,
 
 780 S.E.2d at 548
 
 .
 

 Here, Brewington argues that ALJ Morrison failed to consider the factors set out in
 
 Wetherington
 
 .
 
 [7]
 
 After a careful review of ALJ Morrison's Final Decision, we conclude that the
 
 Wetherington
 
 factors were sufficiently addressed. ALJ Morrison's findings addressed the severity of the alleged misconduct (the SBI's alcohol consumption and truthfulness policies are mandatory), the subject matter, the resulting harm, and the positive and negative portions of Brewington's work history. ALJ Morrison did not make a specific finding on the discipline imposed in other cases involving similar violations, but his findings that Deputy Director Sutton "considered the totality of circumstances regarding this disciplinary issue" and spoke "to several SBI employees prior to recommending a decision to ... Director Collier[,]" were sufficient. We also note that, by way of comparison, the issue in
 
 Wetherington
 
 was whether the trooper had lied about losing his "campaign hat,"
 

 id.
 

 at 585
 
 ,
 
 780 S.E.2d at 544
 
 , whereas Brewington was accused of lying about drinking alcohol while on official duty. Accordingly, for the reasons stated above, we reject Brewington's argument on this issue.
 

 *132
 

 E.
 
 Adequacy of the SBI's Internal Investigation (
 
 De Novo
 
 )
 

 Next, Brewington argues that the SBI's internal investigation into Collier's allegations was "defective because of inadequate methodology and effort[.]" Brewington's specific target is the summary of her internal investigation interview. Referring to the method that Special Agent in Charge Perry used to record the content of that interview as the SBI's "rough note interview process[,]" Brewington asserts that this interrogation technique produced a "cursory investigation" and led to the "spoliation of evidence." The essence of this argument is that Special Agent in Charge Perry's typewritten summary of Brewington's internal investigation interview was defective because the interview was not recorded on tape or video. According to Brewington, "a simple tape recorder would have preserved all evidence."
 

 *26
 
 We conclude that Brewington's contentions have no basis in law or fact. As Special Agent in Charge Perry explained at the OAH Hearing, SBI policy precludes agents from recording non-custodial interviews, such as ones that involve internal investigations. Brewington does not identify any laws requiring that internal investigations concerning law enforcement personnel actions be recorded in any specific fashion, and we are aware of none.
 

 Furthermore, during the interview, Special Agent in Charge Perry-a veteran SBI agent and head of the SBI's Special Investigation Unit-took handwritten notes on Brewington's responses as she gave them. Assistant Special Agent in Charge Cherry, who was present during the entire interview, confirmed that Special Agent in Charge Perry's typewritten summary was an accurate reflection of Brewington's answers to the questions posed. Brewington fails to specify what evidence or information was lost or destroyed due to the method by which her interview was documented, and we decline to speculate on this issue. Accordingly, this argument is without merit.
 

 F.
 
 Alleged Arbitrariness of the Internal Investigation and Brewington's Termination (Whole Record Test)
 

 Brewington's next argument is based on her disclosure to Special Agent in Charge Perry and Assistant Special Agent in Charge Cherry that she was prescribed certain medications for multiple medical conditions. Citing this Court's decision in
 
 Bulloch v. N. Carolina Dep't of Crime Control & Pub. Safety
 
 ,
 
 223 N.C.App. 1
 
 ,
 
 732 S.E.2d 373
 
 (2012), Brewington contends that the SBI "should have used available testing to determine if [she] was experiencing a relevant medical, psychological, alcohol related or other issue." Brewington holds the position that the internal investigation and her eventual termination were arbitrary and capricious.
 

 In
 
 Bulloch
 
 , the petitioner had been diagnosed with depression and bipolar disorder during his tenure with the North Carolina State Highway Patrol.
 
 Id.
 
 at 2,
 
 732 S.E.2d at 376
 
 . Sometime after being taken off of his depression medication and placed on lithium to treat his bipolar condition, the petitioner's employment was terminated due to an incident during which he held his girlfriend's arm behind her back until she cried, threatened to kill himself, and then fired a round from his service weapon into his bedroom floor.
 

 Id.
 

 In the contested case hearing in the OAH, an ALJ concluded that just cause did not exist to support the petitioner's termination for unacceptable personal conduct because the decision was,
 
 inter alia
 
 , "arbitrary and capricious because it failed
 
 *27
 
 to consider a known, underlying medical condition[.]"
 
 Id.
 
 at 3,
 
 732 S.E.2d at 376
 
 (internal quotation marks omitted). The State Personnel Commission (SPC) adopted this conclusion.
 

 On appeal to this Court, the Department of Public Safety argued that the SPC's conclusion concerning the petitioner's medical condition was erroneous. The
 
 Bulloch
 
 Court recognized the general rule that whether just cause exists for termination depends "upon an examination of the facts and circumstances of each individual case."
 
 Id.
 
 at 7,
 
 732 S.E.2d at 379
 
 (citation omitted). The Court then concluded that the record as well as the relevant findings "clearly support[ed] the SPC's conclusion that the
 
 underlying causes
 

 *133
 
 of [the petitioner's]
 
 conduct
 
 were not fully considered by the Department before termination."
 
 Id.
 
 at 15,
 
 732 S.E.2d at 383
 
 .
 

 Unlike the situation in
 
 Bulloch
 
 , there is no indication that Brewington's medical conditions or the medicines she takes to control them were related to the conduct that
 
 caused
 
 her dismissal. Specifically, there is no suggestion that Brewington's medical conditions or medications resulted in her alleged consumption of alcohol while she was on duty or affected her ability to be forthright during the internal investigation. Consequently,
 
 Bulloch
 
 is inapposite and we reject Brewington's argument to the contrary.
 

 G.
 
 Due Process of Law (
 
 De Novo
 
 )
 

 Brewington next argues that she was denied due process of law in two ways. First, Brewington contends that she was not given sufficient notice of the date of her alleged offense. Second, Brewington asserts that the EAC's refusal to allow her to present live witness testimony from Sullivan and Mansfield during her internal grievance hearing impeded her right to "present a defense." Once again, we are not persuaded.
 

 It is well established that career State employees enjoy a property interest in continued employment. This property interest is created by state law,
 
 N.C. Gen. Stat. § 126-35
 
 (a), and is guaranteed by the Due Process Clauses of the Fifth and the Fourteenth Amendments to the United States Constitution.
 
 Peace v. Employment
 

 Sec. Comm'n of N. Carolina
 
 ,
 
 349 N.C. 315
 
 , 322,
 
 507 S.E.2d 272
 
 , 277-78 (1998) ;
 
 Leiphart v. North Carolina School of the Arts
 
 ,
 
 80 N.C.App. 339
 
 , 348-349,
 
 342 S.E.2d 914
 
 , 921,
 
 cert. denied
 
 ,
 
 349 S.E.2d 862
 
 ,
 
 318 N.C. 507
 
 (1986) ;
 
 Pittman v. Dep't Of Health And Human Servs.
 
 ,
 
 155 N.C.App. 268
 
 , 272-73,
 
 573 S.E.2d 628
 
 , 632 (2002),
 
 overruled on other grounds
 
 sub nom.
 
 Pittman v. N. Carolina Dep't Of Health And Human Servs.
 
 ,
 
 357 N.C. 241
 
 ,
 
 580 S.E.2d 692
 
 (2003). "The touchstone of due process is protection of the individual against arbitrary action of government[.]"
 

 *28
 

 Wolff v. McDonnell
 
 ,
 
 418 U.S. 539
 
 , 558,
 
 94 S.Ct. 2963
 
 , 2976,
 
 41 L.Ed.2d 935
 
 , 952 (1974) (citation omitted). The doctrine of procedural due process restricts governmental actions that "deprive individuals of 'liberty' or 'property' interests within the meaning of the Due Process Clause of the Fifth or Fourteenth Amendment."
 
 Mathews v. Eldridge
 
 ,
 
 424 U.S. 319
 
 , 332,
 
 96 S.Ct. 893
 
 , 901,
 
 47 L.Ed.2d 18
 
 , 31 (1976).
 

 "The fundamental premise of procedural due process protection is notice and the opportunity to be heard."
 
 Peace
 
 ,
 
 349 N.C. at 322
 
 ,
 
 507 S.E.2d at
 
 278 (citing
 
 Cleveland Bd. of Educ. v. Loudermill
 
 ,
 
 470 U.S. 532
 
 , 542,
 
 105 S.Ct. 1487
 
 , 1493,
 
 84 L.Ed.2d 494
 
 , 503 (1985) ). "Moreover, the opportunity to be heard must be 'at a meaningful time and in a meaningful manner.' "
 

 Id.
 

 (quoting
 
 Armstrong v. Manzo
 
 ,
 
 380 U.S. 545
 
 , 552,
 
 85 S.Ct. 1187
 
 , 1191,
 
 14 L.Ed.2d 62
 
 , 66 (1965) ). This Court has summarized these essential requirements as follows:
 

 Under federal due process an employee's property interest in continued employment is sufficiently protected by a pre-termination opportunity to respond, coupled with post-termination administrative procedures. Further, the federal due process concern for fundamental fairness is satisfied if the employee receives oral or written notice of the charges against him, an explanation of the employer's evidence, and an opportunity to present his side of the story. To interpret the minimal protection of fundamental fairness established by federal due process as requiring more than this ... would intrude to an unwarranted extent on the government's interest in quickly removing an unsatisfactory employee.
 

 Owen v. UNC-G
 
 ,
 
 121 N.C.App. 682
 
 , 686,
 
 468 S.E.2d 813
 
 , 816 (1996) (internal citations and quotation marks omitted). However, these general federal due process protections must be satisfied in addition to the more specific notice requirements of
 
 N.C. Gen. Stat. § 126-35
 
 (a), which provides:
 

 No career State employee ... shall be discharged ... except for just cause. In cases of such disciplinary action, the employee shall, before the action is taken, be furnished with a statement in writing setting forth the specific acts or omissions
 
 *134
 
 that are the reasons for the disciplinary action and the employee's appeal rights.
 

 This Court has held that the written notice required by section 126-35(a) must include a sufficiently particular description of the "incidents [supporting disciplinary action] ... so that the discharged employee will know precisely what acts or omissions were the basis of his discharge."
 

 *29
 

 Employment Security Comm. v. Wells
 
 ,
 
 50 N.C.App. 389
 
 , 393,
 
 274 S.E.2d 256
 
 , 259 (1981). This "statutory requirement of sufficient particularity[,]"
 
 Owen
 
 ,
 
 121 N.C.App. at 687
 
 ,
 
 468 S.E.2d at 817
 
 , cannot be satisfied if the public employer fails to provide names, dates, or locations, as this information is necessary to allow the employee "to locate [the] alleged violations in time or place, or to connect them with any person or group of persons."
 
 Wells
 
 ,
 
 50 N.C.App. at 393
 
 ,
 
 274 S.E.2d at 259
 
 .
 

 In the present case, it was initially reported that the incident at the Sports Zone occurred in July 2014. Furthermore, the letter notifying Brewington that she was the subject of an internal investigation incorrectly identified the date in question as being "in or around January 2015." Even so, Special Agent in Charge Perry explicitly dispelled any confusion concerning the date of the alleged offense when he notified Brewington that Collier's allegations pertained to the lunch that took place on 3 September 2014. Special Agent in Charge Perry made this clarification before questioning Brewington, and she neither asked for more time to prepare for the interview nor indicated that she was confused as to the date of the allegations. By the time that Brewington received the letter requiring her attendance at the pre-disciplinary conference, there was no confusion as to the date that corresponded to Collier's allegations. The notice given to Brewington concerning the date of the alleged conduct was not constitutionally infirm, as the initial erroneous dates did not impede her ability to respond at a meaningful time. Brewington's pre-termination due process rights were not compromised. Furthermore, because section 126-35(a) 's sufficient particularity requirement was met well before the pre-disciplinary conference occurred, Brewington's ability to fully prepare for the conference was not prejudiced.
 

 Brewington's second argument is that she was deprived "of the procedural due process protection provided by the State's internal grievance system" when the EAC refused to allow live testimony from Mansfield and Sullivan. Given the statutory post-termination procedures afforded Brewington, we discern no due process violation of any kind. Precedent from our Supreme Court indicates that a career State employee's procedural due process rights, at least as they pertain to post-termination procedures, are fully protected by the opportunities to pursue a contested case hearing before an ALJ in the OAH and to obtain judicial review of the ALJ's Final Decision in the appellate division.
 
 See
 

 Peace
 
 ,
 
 349 N.C. at 327
 
 ,
 
 507 S.E.2d at 280-81
 
 (observing that "[a] terminated State employee may avail himself not only of administrative review incorporating full discovery of information and an evidentiary hearing, but may also
 
 *30
 
 obtain judicial review of the final agency decision[,]" and concluding "that this procedure fully comports with the constitutional procedural due process requirements mandated by the Fourteenth Amendment, and
 
 no additional safeguards
 
 are needed to avoid erroneous deprivation") (emphasis added). Moreover, nothing suggests that the denial of Brewington's request to present live testimony before the EAC deprived her of a fair hearing. Indeed, the SBI's written summaries of Mansfield's and Sullivan's statements
 
 were considered
 
 by the EAC and were cited in its memorandum recommending the reversal of Brewington's dismissal. Consequently, we conclude that the EAC hearing fully met procedural due process requirements.
 

 Nonetheless, Brewington further contends that ALJ Morrison "erroneously did not admit [Sullivan's statement to the SBI] despite [the fact] that it was part of the investigation and admissible under [various exceptions to the rule against hearsay.]" As explained above, however, Sullivan's statement was not excluded from the OAH evidentiary record on hearsay grounds; rather, the statement was excluded due to ALJ Morrison's concerns over the credibility and probative value of the statement itself. Brewington does not
 
 *135
 
 specifically challenge this ruling on appeal, and even if she did, procedural due process concerns would not be implicated. The record reveals that while Brewington subpoenaed Sullivan to testify at the OAH proceeding, Sullivan did not appear at the contested case hearing. As such, Brewington was in no way denied the right to present a defense.
 

 H.
 
 SBI Director's Failure to Testify at OAH Hearing (
 
 De Novo
 
 )
 

 Next, Brewington argues that Deputy Director Sutton's testimony at the OAH hearing was insufficient to establish which just cause factors were considered by Director Collier. More specifically, Brewington contends that because Director Collier-who was the ultimate decision-maker responsible for Brewington's dismissal-did not testify, "the ALJ and this Court were deprived of Director Collier's consideration, if any, of the required just cause factors[.]" We are not persuaded.
 

 Our research reveals no absolute requirement that the person who makes the final decision to discipline a public employee must testify at a contested case hearing. Furthermore, if Director Collier had been unavailable to make the final determination upholding Brewington's dismissal, Deputy Director Sutton would have been authorized to make the decision herself. Deputy Director Sutton's testimony was also particularly relevant, as she was responsible for both reviewing the information concerning Brewington's alleged unacceptable personal conduct
 
 *31
 
 and consulting with Director Collier to reach a decision in the matter. The 11 June 2015 letter informing Brewington of her dismissal, which was signed by Deputy Director Sutton on behalf of Director Collier, explained the specific considerations that led to the SBI's decision. Brewington's counsel was free to cross-examine Deputy Director Sutton on these issues, and he did so extensively. The record is replete with the factors that resulted in Brewington's dismissal, and the Final Decision reflects ALJ Morrison's consideration of them. As a result, ALJ Morrison was presented with all the information that was necessary to determine whether Brewington's actions constituted just cause for her dismissal. Brewington's argument is without merit.
 

 V. Conclusion
 

 In closing, we recognize that this case has raised concerns in the law enforcement community, a group worthy of all citizens' gratitude and respect. In its amicus brief, the Fraternal Order of Police contends that Brewington was deprived of fundamental due process protections when Mansfield and Sullivan were not allowed to testify at the EAC hearing, as well as when ALJ Morrison excluded Sullivan's statement from evidence in the contested case hearing. The Fraternal Order of Police also urges us to hold that the decision-maker of a public employer must consider all pertinent just cause factors contained in the State Personnel Manual before disciplining a public employee. We have addressed these issues above.
 

 Even so, we acknowledge that this case involved accusations that ultimately had to be proved or disproved through a large body of conflicting evidence. ALJ Morrison was charged with making credibility determinations, drawing inferences, and finding material facts. After a careful review of the record, we conclude that ALJ Morrison's findings, which are supported by substantial evidence, support his conclusions that Brewington consumed alcohol while on duty and that she was untruthful during the SBI's internal investigation. We further conclude that, under the circumstances of this case, Brewington's violations of SBI policy constituted just cause for her dismissal based on unacceptable personal conduct. Accordingly, we affirm ALJ Morrison's Final Decision in its entirety.
 

 AFFIRMED.
 

 Judge HUNTER, JR. concurs.
 

 Chief Judge McGee concurs by separate opinion.
 

 McGEE, Chief Judge, concurring with separate opinion.
 

 *32
 
 I fully concur in the result, but write separately to note that I disagree with the statement of law that " Section 150B-51 of our State's Administrative Procedure Act (APA) establishes the scope and standard of review
 
 *136
 
 that we apply to the final decision of an administrative agency." Although the majority opinion correctly cites
 
 Harris v. N.C. Dep't of Pub. Safety
 
 , --- N.C.App. ----, ----,
 
 798 S.E.2d 127
 
 , 132 (2017), in support of this statement of law, I dissented from the majority opinion in
 
 Harris
 
 , and
 
 Harris
 
 is currently on appeal to our Supreme Court. As I more fully discussed in
 
 Harris
 
 , I believe
 
 N.C. Gen. Stat. § 126-34.02
 
 provides "adequate procedure for judicial review" of the decision of the ALJ and, for this reason, N.C. Gen. Stat. § 150B-51 does not apply.
 
 Id
 
 . at ----,
 
 798 S.E.2d at
 
 140-41 (citing N.C. Gen. Stat. § 150B-43 (2015) ).
 

 [1]
 

 Special Agent Smith's first name appears as both "Steven" and "Stephen" in the record. We use the former spelling because that is how Collier spelled it at Brewington's contested case hearing.
 

 [2]
 

 An exception to this rule is when an agent is working in an undercover capacity and becomes involved in an unavoidable situation where consumption of alcohol is necessary.
 

 [3]
 

 In
 
 Garrity v. New Jersey
 
 , the United States Supreme Court held that statements elicited as a result of compelling a choice between self-incrimination and loss of a public job are inadmissible in criminal proceedings.
 
 385 U.S. 493
 
 , 500,
 
 87 S.Ct. 616
 
 , 620,
 
 17 L.Ed.2d 562
 
 , 567 (1967) ("We now hold the protection of the individual under the Fourteenth Amendment against coerced statements prohibits use in subsequent criminal proceedings of statements obtained under threat of removal from office, and that it extends to all, whether they are policemen or other members of our body politic.").
 

 [4]
 

 DPS's counsel did not expressly argue that the report should be excluded based upon hearsay grounds, but that was the clear implication. Furthermore, Brewington's counsel made arguments against excluding Sullivan's statement on hearsay grounds.
 

 [5]
 

 In at least two sections of her brief, Brewington does take issue with ALJ Morrison's decision to exclude Sullivan's statement from evidence. However, Brewington focuses on exceptions to the hearsay rule, and she does not make a specific, substantive argument as to why ALJ Morrison's exclusion of Exhibit 14 and the reasons he gave in support of that ruling were erroneous.
 

 [6]
 

 In another section of her brief, Brewington repeats her argument that ALJ Morrison failed to properly consider her character evidence, including Brewington's past SBI performance evaluations-completed by her supervisors-in which she scored high integrity ratings. We reject this contention for the reasons stated above. Brewington further argues that Deputy Director Sutton engaged in an arbitrary and incomplete decision-making process because she did not consider Brewington's previous high integrity ratings before issuing a dismissal recommendation to Director Collier.
 

 The record, however, belies any contention that Deputy Director Sutton's decision was arbitrary or based on inadequate methodology. Deputy Director Sutton testified that while she had no reason to dispute "a particular supervisor's findings" as to Brewington's integrity, the SBI's "personnel evaluation system ... required subjectivity in that you have to be familiar with the employee[,]" and that in her experience, Brewington's reputation for honesty and integrity among her colleagues was "bad." Deputy Director Sutton further testified that the most appropriate considerations for her "extended beyond ... the dimension of integrity" because her primary tasks were to investigate the allegations of on-duty alcohol consumption and whether dismissal would be an appropriate disciplinary action. In her discretion, Deputy Director Sutton determined that "given what [she] was trying to accomplish," she "did not feel that anything prior to the disciplinary actions and the [internal] investigation ... would shed light on the current decision to be made." In sum, we reject Brewington's assertion that Deputy Director Sutton's dismissal recommendation was arbitrary and legally deficient under well-established just cause principles because of her decision not to consider Brewington's past evaluations for integrity.
 

 [7]
 

 Brewington's specific argument is that
 
 Wetherington
 
 indicates that an ALJ must address each and every factor listed in the State Personnel Manual concerning just cause for disciplinary action. We refuse to read such a bright line rule into the
 
 Wetherington
 
 decision. Nevertheless, it appears that the
 
 Wetherington
 
 factors are virtually identical to the ones listed in the State Personnel Manual.