Halikierra Cmty. Servs. LLC v. N.C. Dep't of Health & Hum. Servs., 2022 NCBC 57A.

| | |
|---|---|
| STATE OF NORTH CAROLINA | IN THE GENERAL COURT OF JUSTICE<br>SUPERIOR COURT DIVISION |
| WAKE COUNTY | 20 CVS 6058 |

HALIKIERRA COMMUNITY
SERVICES LLC; DWAYLON
WHITLEY; and MICHAEL SCALES,

      Plaintiffs,

v.

NORTH CAROLINA DEPARTMENT
OF HEALTH and HUMAN
SERVICES, Division of Health
Benefits; MEDICAL REVIEW OF
NORTH CAROLINA, INC. d/b/a The
Carolinas Center for Medical
Excellence; KAY COX, in her
individual capacity; and PATRICK
PIGGOTT, in his individual capacity,

      Defendants.

**AMENDED ORDER AND OPINION
ON ALL DEFENDANTS' MOTIONS
FOR SUMMARY JUDGMENT[1]**

1.     THIS MATTER is before the Court on the Defendants' Motion for Summary Judgment filed on 1 December 2021 by Defendants North Carolina Department of Health and Human Services ("DHHS"), Beverly Kay Cox ("Cox") and Patrick Piggott ("Piggott"); and the Defendant's Motion for Summary Judgment filed on 1 December 2021 by Defendant Medical Review of North Carolina Inc. d/b/a The Carolina Center for Medical Excellence ("CCME") (collectively, the "Motions"). (ECF Nos. 64, 66.) The Motions were filed pursuant to Rule 56 of the North Carolina Rules of Civil Procedure (the "Rules").

---

[1] This amended document is being filed to correct the title in the Court's previous filing of the Order and Opinion on Defendants' Motions for Summary Judgment (ECF No. 83).

2.      For the reasons set forth herein, the Court GRANTS the Motions in part, and DENIES them in part as moot.[2]

*Ralph Bryant Law Firm by Ralph T. Bryant, Jr., for Plaintiff Halikierra Community Services LLC.*

*Joshua H. Stein, Attorney General of the State of North Carolina, by John H. Schaffer and Rajeev K. Premakumar, North Carolina Department of Justice, for Defendants North Carolina Department of Health and Human Services, Division of Health Benefits, Beverly Kay Cox, and Patrick Piggott.*

*Smith, Anderson, Blount, Dorsett, Mitchell & Jernigan, L.L.P., by Grace Anthony Gregson and J. Mitchell Armbruster, for Defendant Medical Review of North Carolina, Inc. d/b/a The Carolinas Center for Medical Excellence.*

Robinson, Judge.

## I.      INTRODUCTION

3.      Plaintiff Halikierra Community Services LLC ("Halikierra") was a home health provider that served Medicaid-eligible beneficiaries in North Carolina for nearly a decade.  At its peak, Halikierra employed almost 600 employees, most of whom provided in-home personal care services to consumers who selected Halikierra as their home health provider.  (Complaint, ECF 5 ["Compl."] ¶ 14.)  This action stems from a 2018 decision by the North Carolina Department of Health and Human Services ("DHHS") to place Halikierra on prepayment claims review, a demanding audit procedure authorized by N.C.G.S. § 108C-7 when DHHS identifies aberrant billing practices or credible allegations of fraud, among other statutorily permitted

---

[2] As noted in paragraphs 107–109, below, as to the claim for Unfair and Deceptive Trade Practices against Defendants Cox and Piggott, the Court determines that it lacks subject matter jurisdiction over that claim and dismisses it pursuant to Rule 12(h)(3) of the Rules of Civil Procedure.

grounds. Halikierra alleges that DHHS acted arbitrarily and capriciously in placing it under prepayment review, violating its rights to substantive due process and equal protection of the law under the North Carolina Constitution. (Compl. ¶¶ 88–144)

4. Halikierra also claims that it was the target of a malicious campaign by DHHS employee Piggott and DHHS consultant Cox, with help from a private auditor, CCME, which caused it to fail prepayment review and close its business. Halikierra alleges that CCME, Piggott, and Cox violated North Carolina's Unfair and Deceptive Trade Practices Act (the "UDTPA") by conspiring against it. Halikierra seeks relief from all parties in the form of compensatory and punitive damages resulting from the loss of its business.

## II. FACTUAL BACKGROUND

5. The Court does not make findings of fact when ruling on a motion for summary judgment. However, "to provide context for its ruling, the Court may state either those facts that it believes are not in material dispute or those facts on which a material dispute forecloses summary adjudication." *Ehmann v. Medflow, Inc.*, 2017 NCBC LEXIS 88, ¶ 22 (N.C. Super. Ct. Sept. 26, 2017).

6. Halikierra was a limited liability company formed under the laws of North Carolina in 2009. (Compl. ¶ 1.)

7. Halikierra was enrolled as a provider in the North Carolina Medicaid Program and offered personal care services ("PCS") to clients within their homes by employing aides to assist clients with daily life activities. (Compl. ¶ 4.)

8.     The majority of Halikierra's revenue came from its Medicaid contract with DHHS.  (Compl. ¶ 16.)

9.     DHHS oversees the provision of health and human services in North Carolina and is responsible for the administration of North Carolina's Medicaid Program.  The Office of Compliance and Program Integrity ("OCPI") is a unit of DHHS and is responsible for managing the Medicaid program and ensuring compliance with Medicaid rules and clinical coverage policies.[3]  (Defs. Ex. J, ECF No. 69.10 ["OAH Final Decision"].)

10.     Piggott was the Associate Director for Investigations within OCPI. (Compl. ¶ 7.)

11.     Cox was a nurse consultant for OCPI who oversaw the prepayment claims review program as a part of North Carolina's Medicaid program.  (Compl. ¶¶ 8, 9.)

12.     Carol Lukosius ("Lukosius") was the nurse consultant with OCPI responsible for overseeing the performance of Medicaid providers subject to post- or prepayment review.  (Defs. Ex. E ¶ 15, ECF No. 69.5 ["Lukosius Aff."].)

13.     CCME is a nonprofit organization that contracts with DHHS to conduct audits on its behalf.  (Pls. Ex. 26, 10:18–12:7, ECF No. 75.26 ["Winters Dep."].)  As compensation, CCME receives a base monthly rate from DHHS and a percentage of

---

[3] Effective 1 August 2018, the Division of Medical Assistance (DMA) and Division of Health Benefits (DHB) combined into one division called the NCDHHS Division of Health Benefits. *See* *DMA is Now DHB*, NC Tracks (Sept. 4, 2018) https://www.nctracks.nc.gov/content/public/providers/provider-communications/2018-announcements/Division-of-Medical-Assistance--DMA--is-Now-the-Division-of-Health-Benefits--DHB-.html.  The NC Medicaid Office of Compliance and Program Integrity (OCPI) is a unit of NCDHHS Division of Health Benefits.

the monetary value of claims it denies. (Winters Dep. 12:19–12:24.) That percentage is less than one percent of the denied claims. (Winters Dep. 15:10–15:13.)

14. Robyn Winters ("Winters") was a contract supervisor for CCME. (Compl. ¶ 11.)

15. CCME reviews provider claim documentation to determine if that documentation meets federal and state requirements, including the criteria set forth in the applicable Clinical Coverage Policy, Basic Medicaid Billing Guide, and the Medicaid provider agreement. (Pls.' Ex. 1, 3, ECF No. 75.1 ["CCME Letter"].)

16. Following physician authorization permitting a patient to receive Medicaid-funded PCS, a state contractor known as Liberty Healthcare sends a registered nurse to assess the number of hours per month of PCS a client needs. (Def. CCME Ex. D 22:1–22:22, ECF No. 67.4 ["Scales Dep."].) Halikierra was permitted to seek reimbursement only for the services and hours determined to be necessary by the Liberty Healthcare nurse. (Scales Dep. 28:1–28:10.)

17. Patients eligible to receive Medicaid-funded PCS can select their provider. When a client selected Halikierra as their provider, Halikierra would send one of its own nurses to the client's home to design a Plan of Care based on the initial assessment by Liberty Healthcare. (Def. CCME Ex. B 34:3–35:8, ECF No. 67.2 ["Whitley Dep."].) Halikierra then sent aides to provide the specified care. (Scales Dep. 27:4–27:17.) Aides would record time spent providing services to clients on a time sheet and submit the time sheets to Halikierra weekly. (Scales Dep. 27:12–

28:23.) Halikierra used the time sheets to prepare requests for reimbursement by Medicaid. (Scales Dep. 27:12–28:23.)

18. The goal of OCPI is to stop fraud, waste and abuse in Medicaid. It is responsible for ensuring that PCS providers are complying with applicable laws, regulations, and the relevant Clinical Coverage Policies. (Lukosius Aff. ¶ 9.)

19. OCPI can audit a provider's billing and services using two mechanisms, post-payment review and prepayment review. (Lukosius Aff. ¶¶ 11–12.) Post-payment review involves inspecting a provider's records to determine whether its documentation supports the amount billed to and reimbursed by Medicaid. (Lukosius Aff. ¶ 11.) If post-payment review reveals errors, OCPI may recover the amount of funds it determines were paid in error. (Lukosius Aff. ¶ 11.)

20. Prepayment review, on the other hand, involves auditing a provider's Medicaid billing *prior* to Medicaid funds being disbursed. (Lukosius Aff. ¶ 13.) The grounds for placing a provider on prepayment review are established by statute and include but are not limited to: "receipt by [DHHS] of credible allegations of fraud"; "identification of aberrant billing practices as a result of investigations"; "data analysis performed by [DHHS]"; or "other grounds as defined by [DHHS]." (Lukosius Aff. ¶¶ 12–13.) *See* N.C.G.S. § 108C-7(a).

21. On 1 June 2018, OCPI initiated the prepayment review process by sending a letter to CCME requesting that it begin a review of Halikierra. (Winters Dep. 140:7–140:9.) Before placing Halikierra on prepayment review, OCPI investigated complaints that Halikierra was billing for services that were not actually provided

and employing individuals who were not qualified to deliver PCS. (Pls.' Ex. 28, 7:2–7:17, 25:10–25:20, ECF No. 75.28 ["Piggott 2019 Dep."]; Pls.' Ex. 29, 20:3–20:20; 22:5-22:13, ECF No. 75.29 ["Piggott 2021 Dep."].) As part of its investigation, OCPI previously conducted post-payment reviews of Halikierra's Medicaid billing using a third-party vendor. (Piggott 2021 Dep. 18:17–20:8.) OCPI determined that Halikierra erred in its Medicaid billing on at least three occasions, resulting in Halikierra being required to pay back funds to DHHS. (Whitley Dep. 78:4–79:4.)

22. By October 2017, OCPI had issued two Tentative Notices of Determination notifying Halikierra of adverse investigative findings and overpayment determinations. (Lukosius Aff. ¶ 16.)

23. In addition, OCPI compared Halikierra's billing trends to the billing trends of other North Carolina PCS providers serving similar demographics to identify potentially fraudulent activity. (Piggott 2021 Dep. 24:2–25:6.)

24. While OCPI was conducting its investigation, the Department of Safety and Health Regulations (the "DSHR"), a separate department within DHHS, received a complaint alleging that Halikierra was operating out of unlicensed sites. (DHHS Br. Ex. D 28:9–28:18, ECF No. 69.4 ["Meyer Dep."].)

25. In October 2017, Piggott and Lukosius discussed placing Halikierra on prepayment review, (Lukosius Aff. ¶ 19), and Halikierra was placed on prepayment review following that conversation (Lukosius Aff. ¶ 19; Piggott 2021 Dep. 53:10–53:24, 55:1–55:20).

26. On 4 June 2018, CCME notified Halikierra by letter that it was being placed on prepayment review. (CCME Letter 1.) In this letter, CCME stated DHHS' decision to place Halikierra on prepayment review was because of aberrant billing practices and data analysis performed by DHHS. (CCME Letter 1.)

27. CCME's role in conducting the prepayment review included approving or denying Halikierra's Medicaid reimbursement claims, reporting Halikierra's monthly accuracy rate (i.e., what percent of claims was approved as being correct) to DHHS, and reporting any patient safety concerns to DHHS within 24 hours of discovery. (Winters Dep. 18:3–18:17, 20:1–20:2.)

28. CCME noted in its prepayment review notice that it utilizes audit tools developed by DHHS Division of Health Benefits. (CCME Letter 3.)

29. CCME informed Halikierra that any claims for payment approved after review would be disbursed within 20 days after submission by Halikierra in accordance with N.C.G.S. § 108C-7. (CCME Letter 1; Whitley Dep. 85:8–85:14.)

30. Defendants testified regarding their reason for placing Halikierra on prepayment review. Piggott said that he made his decision after having conversations with either Patricia Meyer ("Meyer") or Lukosius. (Piggott 2021 Dep. 51:1–52:11.) Piggott's decision was based on these conversations, as well as his review of Halikierra's case file and OCPI's analysis of Halikierra's billing practices. (Piggott 2021 Dep. 52:21–54:20.) According to Cox, Halikierra was placed on prepayment review after a meeting of OCPI investigators during which complaints about Halikierra employees and a data analytics packet produced by OCPI analysts

were discussed. (Pls.' Ex. 27 14:2–14:21, ECF No. 75.27 ["Cox Dep."].) Regarding the data analytics packet, Cox stated that investigators considered "how are they billing, [and] how do they fall in line with other agencies that are of a similar size in the similar areas." (Cox Dep. 15:13–15:16.) Cox did not remember to which investigator she spoke before initiating the prepayment review process. (Cox Dep. 10:23–11:8.)

31.     Attached to CCME's 4 June 2018 letter was a list of documents Halikierra was required to provide as part of the prepayment review process, including "[p]roof that criminal history [checks] for all staff providing care to [the PCS] beneficiary was conducted prior to the date of service billed." (CCME Letter 8  ¶ 17.) In response, Halikierra sent CCME the results of criminal background checks conducted on all its employees. (Whitley Dep. 94:16–96:4; Winters Dep. 33:1–33:5.)

32.     On 25 July 2018, CCME notified DHHS that multiple aides employed by Halikierra had felony convictions. (Winters Dep. 40:4–41:21.) CCME's regular practice was to notify DHHS any time it had actual knowledge that a provider was employing an individual who had been convicted of one of the crimes enumerated in N.C.G.S. § 108C-4 or in DHHS' clinical policies. (Winters Dep. 44:25–45:4.) Further, CCME was contractually required to report to DHHS "patient safety concern[s] of any kind . . . within 24 hours." (Winters Dep. 18:3–20:2.)

33.     After DHHS was notified of the felony convictions, Piggott requested that CCME provide a sample of the criminal background checks. (Winters Dep. 145:22–146:3, 147:8–147:16.) In response, CCME hand-delivered to Piggott encrypted disks

containing files holding Halikierra employees' criminal histories. (Winters Dep. 149:20–150:7.)

34. The record reflects that approximately twenty out of a total of 582 Halikierra employees had criminal histories. (Winters Dep. 64:3–65:12.)

35. On 2 August 2018, DHHS referred Halikierra to the Medical Investigation Division ("MID") of the North Carolina Attorney General's Office for investigation of potential fraud. (Pls.' Ex. 11, ECF No. 75.11.) Following the MID referral, on 6 August 2018, DHHS suspended Halikierra as a Medicaid participant. (Pls.' Ex. 2, 1, ECF No. 75.2 ["Suspension Letter 1"].)

36. DHHS notified Halikierra that its suspension and referral to MID were due to suspicion that Halikierra was billing for unprovided services, providing services using unauthorized personnel (i.e., personnel with criminal histories that made them ineligible), and operating from unlicensed facilities. (Suspension Letter 1, 1.)

37. On 13 September 2018, OCPI requested that, in addition to a routine monthly claim accuracy report, CCME provide a report regarding claims Halikierra was submitting for prepayment review that were suspected to be fraudulent, provided by ineligible employees, or concerned patient safety. (Winters Dep. 208:10–208:21, 210:5–210:7, 213:5–214:22.)

38. The same day, CCME provided OCPI with a Preliminary Report indicating that claims totaling $128,230 for the period 18 June 2018 through 29 July 2018 (the "report period") were suspect. (Winters Dep. 212:2–212:5; Pls.' Ex. 16, 1, ECF No. 75.16.)

39.     On 18 September 2018, MID notified DHHS that it was declining DHHS' referral of Halikierra for investigation because the "potential for successful prosecution is low." (Pls.' Ex. 17, ECF No. 75.17 ["MID First Response"].)

40.     On 28 September 2018, CCME sent DHHS a Final Report on claims submitted by Halikierra for the report period (together, the "CCME Reports"). CCME concluded that there was $530,579 in suspect claims. (Pls.' Ex. 18, 1–2, ECF No. 75.18.)

41.     DHHS terminated Halikierra from participation in the Medicaid program on 2 October 2018. (Pls.' Ex. 3, 1, ECF No. 75.3 ["First Termination Notice"].) Reasons cited for the termination included Halikierra's operation of unlicensed sites, and its employment of individuals who had felony convictions prohibited either by DHHS' clinical coverage policies or by N.C.G.S. § 108C-4. (First Termination Notice 1–2.)

42.     When a provider is placed on prepayment review, DHHS monitors accuracy ratings for six months as required by N.C.G.S. § 108C-7(e). (Winters Dep. 169:14–169:24.) A seventy percent (70%) or higher accuracy rating is required for three consecutive months during the six-month period, or the provider is terminated from the program. (Winters Dep. 169:14–169:24.) The accuracy rating is a percentage calculated by dividing the total number of line items comprising a provider's Medicaid claims by the number of line items approved. (Winters Dep. 170:4–170:8.) For example, "if the provider submits 100 detail line items and 80 of those [are approved]

and 20 of those [are denied], they have an 80 percent accuracy rate." (Winters Dep. 170:8–170:10.)

43. Because Halikierra's participation in the Medicaid program was suspended on 6 August 2018, Halikierra only had reviewable claims for purposes of prepayment review for July and the first six days of August of 2018. (CCME Br. Supp. Mot. Dismiss Ex. 2, ¶ 21, ECF No. 49.3 ["Winters Aff."].)

44. According to CCME, Halikierra's passage rate was 10.61% for claims it submitted in July 2018, and 16.10% for claims it submitted in August 2018. (Winters Aff. ¶ 21.) This means mathematically that, for July 2018, CCME determined that almost 9 out of 10 line items on Halikierra's billing to Medicaid were improper, and for August 2018, almost 84% of its claims were improper.

45. Halikierra ran out of funds to continue operating and closed its doors in mid-August of 2018. (Whitley Dep. 99:4–99:15.)

46. On 12 October 2018, MID declined for a second time DHHS's referral to investigate Halikierra. (Pls.' Ex. 19, ECF No. 75.19 ["MID Second Response"].) MID notified DHHS that the matter was "refer[red] back to [DHHS] for review or administrative action. [DHHS] may proceed with any administrative action it deems appropriate." (MID Second Response.)

47. On 4 February 2020, Halikierra was administratively dissolved by the North Carolina Secretary of State. (CCME Br. Supp. Mot. Dismiss Ex. 1, ECF No. 49.2.)

48. On 13 December 2018 Halikierra initiated an administrative proceeding by petition before the North Carolina Office of Administrative Hearings ("OAH") against DHHS claiming its denial of Halikierra's Medicaid claims was improper. (Pls.' Ex. 36, ECF 75.36.) On 8–9 December 2020, OAH conducted a hearing on Halikierra's petition. (CCME Br. Ex. J 3, ECF No. 69.10 ["OAH Final Decision"].) The issue for hearing was whether DHHS acted arbitrarily, erroneously, and failed to use proper procedure, or in the alternative, whether it failed to act as required by law when it denied Halikierra's claims for Medicaid reimbursement. (OAH Final Decision 2.)

49. On 14 July 2021, the OAH issued its Final Decision upholding the denial of Halikierra's Medicaid claims. (OAH Final Decision 8.) The OAH found as fact that Halikierra had submitted claims for services in the total amount of $1,129,733.27 for the months of July and August 2018. (OAH Final Decision 6.) The OAH also found that DHHS properly denied $982,789.50 of those claims. (OAH Final Decision 6.)

50. The OAH concluded as a matter of law that DHHS had authority under 10A NCAC 22F .0104(c) to "check eligibility, duplicate payments, third party liability, and unauthorized or uncovered services by means of prepayment review, computer edits and audits, and investigation." (OAH Final Decision 8.) The OAH further concluded that Halikierra billed for "uncovered services" including services that were "non-complian[t] with [DHHS'] Clinical Coverage Policies . . ." with which Halikierra had agreed to comply as a condition of participation in the Medicaid program. (OAH Final Decision 8.)

51. Based on its findings of fact and conclusions of law, the OAH upheld the denial of Halikierra's Medicaid payments because the claims were "policy non-compliant."[4] (OAH Final Decision 8.)

52. In its Complaint in this action, Halikierra alleges that DHHS, as well as the legislation subjecting it to prepayment review, violated Halikierra's substantive due process and equal protection rights under the North Carolina Constitution. (Compl. ¶¶ 10–15.) Halikierra further alleges that CCME committed fraud against it, (Compl. ¶¶ 15–16), and that CCME violated the UDTPA during its dealings with Halikierra (Compl. ¶¶ 16–18). Halikierra alleges that Piggott and Cox engaged in a conspiracy to restrain trade injuring it in violation of the UDTPA, (Compl. ¶¶ 18–20), and that CCME joined with Piggott and Cox to engage in fraud, unfair and deceptive trade practices, and restraint of trade, (Compl. ¶¶ 20–21).

53. Halikierra seeks actual damages from all parties in excess of $100 million, as well as punitive damages pursuant to N.C.G.S. § 1D-1. (Compl. ¶¶ 21–22.)

### III. PROCEDURAL BACKGROUND

54. Halikierra, and two of its employees, Dwaylon Whitley and Michael Scales, filed the Complaint on 27 May 2020. (ECF No. 5.)

55. On 5 August 2020, CCME filed a Motion to Dismiss all claims brought by Halikierra against it. (ECF No. 15; ECF No. 16.) On 6 August 2020, DHHS, Piggott and Cox also filed motions to dismiss all claims against them as brought by Halikierra. (ECF Nos. 22–24.)

---

[4] The record before the Court indicates that Halikierra has appealed the OAH's decision.

56.     On 25 March 2021, the Court issued its Order and Opinion on the Motions to Dismiss.  (ECF No. 55.)  The Court dismissed Halikierra's: (1) facial constitutional challenges against DHHS and (2) fraud claim against CCME.[5]  (ECF No. 55.)

57.     Following discovery, on 1 December 2021, Defendants filed the Motions. (ECF Nos. 64–69.)  Halikierra filed a brief in opposition to the Motions on 10 January 2022, (ECF Nos. 73–75), and Defendants filed reply briefs on 27 January 2022, (ECF Nos. 79–81).

58.     On 12 April 2022, the Court held a hearing on the Motions.  (*See* ECF No. 82.)  Having received and reviewed all briefs and exhibits related to the Motions, and after considering the arguments of counsel at hearing, the Motions are now ripe for resolution.

## IV.     LEGAL STANDARD

59.     Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that any party is entitled to judgment as a matter of law."  N.C.G.S. § 1A-1, Rule 56(c).  "A 'genuine issue' is one that can be maintained by substantial evidence."  *Dobson v. Harris*, 352 N.C. 77, 83 (2000).

60.     The moving party bears the burden of showing that there is no genuine issue of material fact and that the party is entitled to judgment as a matter of law. *Hensley v. Nat'l Freight Transp., Inc.*, 193 N.C. App. 561, 563 (2008).  The movant

---

[5] The Court also dismissed all claims brought by individual plaintiffs Dwaylon Whitley and Michael Scales for lack of standing.  (ECF No. 55, ¶ 58(a).)

may make the required showing by proving "an essential element of the opposing party's claim does not exist, cannot be proven at trial, or would be barred by an affirmative defense, or by showing through discovery that the opposing party cannot produce evidence to support an essential element of her claim." *Dobson*, 352 N.C. at 83 (citations omitted).

61. "Once the party seeking summary judgment makes the required showing, the burden shifts to the nonmoving party to produce a forecast of evidence demonstrating specific facts, as opposed to allegations, showing that he can at least establish a *prima facie* case at trial." *Gaunt v. Pittaway*, 139 N.C. App. 778, 784–85 (2000).

62. The Court must view the evidence in the light most favorable to the nonmovant. *Dobson*, 352 N.C. at 83. However, the nonmovant "may not rest upon the mere allegations or denials of his pleadings, but his response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If [the nonmovant] does not so respond, summary judgment, if appropriate, shall be entered against [the nonmovant]." N.C.G.S. § 1A-1, Rule 56(e).

## V. ANALYSIS

### A. Constitutional Claims Against DHHS

63. The Law of the Land Clause of the North Carolina Constitution provides that "[n]o person shall be taken, imprisoned, or disseized of his freehold, liberties, or privileges, or outlawed, or exiled, or in any manner deprived of his life, liberty, or

property, but by the law of the land." N.C. Const. art. I, § 19. It is synonymous with the Due Process Clause in the Fourteenth Amendment of the United States Constitution. *A-S-P Associates v. Raleigh*, 298 N.C. 207, 213 (1979) ("The terms 'law of the land' and 'due process of law' are synonymous").

64. Article I, Section 19 of the North Carolina Constitution also guarantees "equal protection under the law[.]" *Rhyne v. K-Mart Corp.*, 358 N.C. 160, 180 (2004). Under this section, "[n]o person shall be denied the equal protection of the laws; nor shall any person be subjected to discrimination by the State because of race, color, religion, or national origin." N.C. Const. art. I, § 19. All similarly situated persons must be "treated alike." *State v. Harris*, 242 N.C. App. 162, 166 (2015).

65. When an individual's constitutional rights have been abridged, in the absence of an adequate state remedy, the individual has a direct claim against the State. *Corum v. University of North Carolina*, 330 N.C. 761, 782 (1992).[6]

66. Halikierra alleges that DHHS violated its substantive due process rights by arbitrarily placing it on prepayment review. (Pls.' Resp. Opp. Def. DHHS Mot. Summ. J. 19, ECF No. 73 ["Pls.' Opp. DHHS"].) Halikierra also alleges that DHHS violated its equal protection rights by treating it differently from other similarly situated Medicaid PCS providers by placing it on prepayment review. (*See* Pls.' Opp. DHHS 8, 11, 14, 21.)

---

[6] Arguments concerning sovereign immunity were rejected by the Court at the motion to dismiss stage, and thus this Court does not address the issue of State sovereign immunity in this Opinion. *See Halikierra Cmty. Servs. LLC v. N.C. HHS,* 2021 NCBC LEXIS 27, ¶ 25 (N.C. Super. Ct. Mar. 25, 2021).

67.     Halikierra's claims asserting the unconstitutionality of N.C.G.S. § 108C-7 due to vagueness or unconstitutional delegation of legislative authority are facial challenges that were previously dismissed by the Court and, therefore, are inappropriately argued at the summary judgment stage of the case. (DHHS Br. Supp. Mot. Summ. J. 23, ECF No. 65 ["DHHS Br."]) *See Halikierra Cmty. Servs. LLC v. N.C. HHS,* 2021 NCBC LEXIS 27, ¶ 22 (N.C. Super. Ct. Mar. 25, 2021) (Halikierra's facial challenges were "moot because Halikierra ha[d] dropped its facial challenges. What remain[ed was] the allegation that DHHS acted arbitrarily when it placed Halikierra on prepayment review."). As a result, the Court will not re-consider Halikierra's arguments relating to the facial validity of the enabling legislation. *See id.*

## I.     Adequate State Remedy

68.     DHHS argues that, under *Corum*, Halikierra cannot bring constitutional claims against the State because it has an adequate state remedy against Piggott and Cox individually. (DHHS Br. 24.) In DHHS' view, the UDTPA claims against the individual Defendants provide an adequate remedy because Halikierra seeks the same relief under both its tort and constitutional claims. (DHHS Br. 25.) Halikierra contends that allowing DHHS to shield itself from liability in this way would fail to address DHHS' arbitrary acts and would allow "constitutionally infirm conduct [to] continue unabated." (Pls.' Opp. DHHS 25.)

69.     To be adequate, an alternative remedy must be available and accessible to the plaintiff. *See Taylor v. Wake County*, 258 N.C. App. 178, 183 (2018). For reasons

discussed *infra*, (*see* ¶¶ 107–109), the claims against Piggott and Cox fail because the Court lacks subject matter jurisdiction over those claims. The record reflects that Piggott and Cox acted as representatives of the State at all relevant times DHHS was dealing with Halikierra, and thus claims cannot be brought against them individually. *See Sperry Corp. v. Patterson*, 73 N.C. App. 123, 125 (1985) ("When defendants act in their official capacity, it is the State acting" and individuals acting in their official capacity when dealing with a plaintiff are not subject to N.C.G.S. § 75-1.1). Because the claims brought against Piggott and Cox do not provide an adequate state remedy and no other remedy is available to Halikierra, the Court concludes that a *Corum* claim is appropriate. *Cf. Craig v. New Hanover County. Bd. Of Education*, 363 N.C. 334, 342 (2009) (holding claims against agents of the State Board of Education were barred and thus did not serve as an adequate state remedy).

## II.     Substantive Due Process Claim

70.     Halikierra argues that DHHS' decision to place it on prepayment review was arbitrary and capricious because of the lack of policies, procedures, criteria, guidelines, or standards to govern the decision-making process, and because DHHS failed to follow the few relevant policies and procedures that did exist. (Pls.' Opp. DHHS 20.) DHHS argues that these allegations are unsubstantiated and that the enabling statute, N.C.G.S. § 108C-7, and its regulations, "permit[ ] DHHS to place a provider on prepayment review where DHHS suspects a Medicaid provider has committed some sort of abuse." (DHHS Br. 27–28.)

71.    DHHS also contends that the statute does not require it to provide Halikierra with information beyond the grounds on which it based its decision to engage in prepayment review, as enumerated under N.C.G.S. § 108C-7. (DHHS Reply Br. 13, ECF No. 79 ["DHHS Reply"].)

72.    "The touchstone of due process is protection of the individual against arbitrary action of [the] government." *Brewington v. N.C. Dep't of Pub. Safety*, 254 N.C. App. 1, 27 (2017) (internal quotations omitted). "In general, substantive due process protects the public from government action that unreasonably deprives them of a liberty or property interest." *Toomer v. Garrett*, 155 N.C. App. 462, 469 (2002) (citing *Huntington Properties, L.L.C. v. Currituck Co.*, 153 N.C. App. 218 (2002)).

73.    If the government action at issue implicates a fundamental liberty or property interest, then strict scrutiny applies;[7] otherwise, "the government action need only have a rational relation to a legitimate governmental objective to pass constitutional muster."[8] *Id.* In a due process analysis, a valid governmental objective can include the protection of the public health, morals, order, safety, or general welfare. *Huntington*, 153 N.C. App. at 230 (citing *Treants Enterprises, Inc. v. Onslow County*, 83 N.C. App 345, 352 (1986)).

74.    Where it is appropriate to apply the rational basis standard, the governmental act is entitled to a presumption of validity. *Huntington*, 153 N.C. App.

---

[7] To the extent that a fundamental liberty interest in implicated because Halikierra's contract was terminated due to fraud, the OAH hearing provided sufficient process by which plaintiffs could have cleared their name. *Presnell v. Pell*, 298 N.C. 715, 724–25 (1979).

[8] This legitimate governmental objective need not be the actual objective of the state actors. *Toomer v. Garrett*, 155 N.C. App. 462, 469 (2002) (citing *Huntington Properties, L.L.C. v. Currituck Co.*, 153 N.C. App. 218 (2002)).

at 230. When determining whether an agency decision is arbitrary or capricious under this standard, "[a]dministrative agency decisions may be reversed if they are patently in bad faith, or whimsical in the sense that they indicate a lack of fair and careful consideration[,] or fail to indicate any course of reasoning and the exercise of judgment." *ACT-UP Triangle v. Commission for Health Servs.*, 345 N.C. 699, 707 (1997) (citations and internal quotations omitted). The arbitrary or capricious standard is a difficult one to meet. *Id.*

75. According to DHHS, Piggott, Cox, and other members of the DHHS staff had bi-weekly meetings to discuss placing providers on prepayment review. (Cox Dep. 10:5–10:15.) Halikierra had active complaints against it, data analytics showed potential billing issues, and other issues arose during post-payment reviews resulting in Halikierra being required to reimburse Medicaid for improper billing. DHHS explains that Piggott and Cox had multiple discussions with DHHS investigators, prior to Piggott ultimately deciding to place Halikierra on prepayment review. (DHHS Br. 7–9; DHHS Reply 14.)

76. Halikierra contends that the decision to place it on prepayment review was arbitrary and capricious. The record before the Court, however, demonstrates that the decision to place Halikierra on prepayment review was neither arbitrary nor capricious. (DHHS Reply 15.) Indeed, credible allegations of fraud and aberrant billing practices identified by investigation and data analysis are specified as a basis for placing a provider on prepayment review under N.C.G.S. § 108C-7. Halikierra

has come forward with no evidence sufficient to create a material issue of fact on this point.

77. Further, the record reveals no material inconsistencies in the testimony of the witnesses. In his official capacity, Piggott had the authority, and decided, to place Halikierra on prepayment review. Lukosius told Piggott about complaints against Halikierra as well as adverse findings from prior post-payment reviews. Investigators from the data analytics team, including Lukosius, informed Cox of suspicious data trends. After Piggott decided to place Halikierra on prepayment review, Cox initiated the process by drafting a memo to CCME. In short, the record does not reveal the inconsistencies that Halikierra argues exist.

78. As the record shows, matters investigated included complaints submitted to DHHS against Halikierra alleging that it was billing for unperformed services, that those services were performed by unauthorized aides, and that there were at least three prior adverse findings which resulted in it being required to pay back funds to the State for overbilling Medicaid. Further, data analysis revealed that Halikierra had unusual billing trends when compared with other providers within a comparable demographic of Medicaid PCS providers.

79. Finally, Halikierra's argument that DHHS should have followed a 2016 legislative report is irrelevant. The report, published by the Legislative Services Office Program Evaluation Division of the General Assembly, reviews aggregate data to identify ways in which N.C.G.S. § 108C *et seq.* may be improved by the General Assembly. (*See* Pls.' Ex. 21, ECF No. 75.21 ["Legislative Report"].) The Legislative

Report does not speak to whether DHHS acted arbitrarily or outside of the law in this case. And in any event, there is no evidence before the Court that DHHS was required to comply with a program evaluation in its conduct, absent a directive from the Legislature through enacted legislation.

80. In sum, there is no evidence in the record to support a finding that DHHS' decision to place Halikierra on prepayment review was arbitrary or capricious. Rather, the evidence in the record reflects that the decision was based on legitimate concerns about Halikierra's billing practices.

81. Accordingly, the Court concludes that Halikierra has failed to create a genuine issue of material fact regarding whether DHHS' actions were arbitrary or capricious and therefore GRANTS the Motion as to the claim that DHHS violated Halikierra's due process rights under the North Carolina Constitution.

### III. Equal Protection Claim

82. Halikierra alleges that "DHHS arbitrarily treated it differently from similarly situated providers," violating its right to equal protection under Article 1, Section 19 of the North Carolina Constitution. (Pls.' Opp. DHHS 21.)

83. A party may bring an equal protection claim when it alleges that the government "intentionally treated [it] differently from others similarly situated and that there is no rational basis for the difference in treatment." *Clayton v. Branson*, 170 N.C. App. 438, 457 (2005) (quotations omitted).

84. DHHS argues that Halikierra failed to present evidence to substantiate allegations that DHHS targeted Halikierra in a "spiteful effort" to cause it to fail or

that it acted out of animosity with respect to the growth or size of Halikierra's business, the owners' races, or any other factor other than justified suspicion of abuse. (DHHS Br. 28–29.) Halikierra, however, contends that Piggott's deposition testimony contains "repeated admission[s]" that similarly situated Medicaid providers were not placed on prepayment review. (Pls.' Opp. DHHS 22.) Halikierra also argues that "DHHS used a different process for Halikierra than for other providers to place it on prepayment review," and that the decision to do so was "because it had become one of the largest personal care service providers in the state." (Pls.' Opp. DHHS 22.)

85. After careful review, the Court determines that Halikierra's arguments are not supported by the record. First, Halikierra does not identify where in the record Piggott admits that DHHS put Halikierra through a process that differed from that used with other Medicaid providers when deciding whether to place it on prepayment review. Rather, Piggott repeatedly said that his reasons included discussions with Meyer and Lukosius about Halikierra's prior adverse findings after post-payment review audits and an analysis of data comparing the billing practices of Halikierra with those of similar providers. (*See* Piggott 2021 Dep. 51:1–54:20; Lukosius Aff. ¶ 19.)

86. Nor do Halikierra's arguments about Cox's statements accurately reflect her testimony. Cox did not testify to facts that would support a conclusion that Halikierra was punished for being a large Medicaid provider. Rather, Cox testified that the decision was due to third-party complaints against Halikierra and data analysis that compared Halikierra's billing practices to other agencies "that are of

similar size in the similar areas." (Cox Dep. 15:10–16:21.) When asked if all "the PCS providers in North Carolina with the high volume get placed on prepayment review," Cox responded that she did not know "because they don't look at individual names of who the providers are . . . [t]hey just look at volume . . . [i]t's just saying due to their peer-to-peer review this provider is billing significantly higher." (Cox Dep. 19:3–19:13.)

87.     The evidence fails to raise a genuine issue of material fact that either DHHS or its agents targeted Halikierra arbitrarily compared to other Medicaid providers. Rather, the evidence in the record reflects that Halikierra's billing was examined by a computer program that categorized Halikierra anonymously for the express purpose of comparing its billing practices to similarly situated providers. (*See* Cox Dep. 19:2–20:21.)

88.     Accordingly, because Halikierra has not presented any evidence tending to show that it was arbitrarily targeted or treated differently than other similarly situated Medicaid providers, there is no genuine issue of material fact, and DHHS is entitled to judgment as a matter of law as to this claim. The Court therefore GRANTS the Motion as to Halikierra's Equal Protection claim.

**B.     Unfair and Deceptive Trade Practice Act Claims**

      **I.     Against CCME**

89.     "To establish a violation of N.C.G.S. § 75-1.1, the plaintiff must show: (1) an unfair and or deceptive act or practice, (2) in or affecting commerce, and (3) which proximately caused injury to plaintiffs. The question of what constitutes an unfair

or deceptive trade practice is an issue of law." *Stott v. Nationwide Mut. Ins. Co.*, 183 N.C. App. 46, 53 (2007) (internal citations omitted). "A practice is unfair if it is unethical or unscrupulous, and it is deceptive if it has a tendency to deceive." *Dalton v. Camp*, 353 N.C. 647, 656 (2001) (citation omitted).

90. Halikierra alleges that CCME acted in an unfair and deceptive manner by falsifying data during prepayment review, misleading Halikierra into unnecessarily providing results of its employee background checks, illegally providing Halikierra's employee background check results to DHHS, and intentionally inflating the number of convicted felons employed by Halikierra. Halikierra further asserts that CCME had a financial motive for improperly denying Halikierra's Medicaid claims. (Pls.' Resp. Opp. Summ. J. CCME, Piggott & Cox 2, 11–12, ECF No. 74 ["Pls.' Br. Opp. CCME"].)

91. CCME responds that it did not mislead Halikierra into providing results of employee background checks. Rather, CCME sent a form questionnaire with instructions, and Halikierra on its own deviated from the instructions and sent more information than was requested. (Def. CCME Br. Supp. Mot. Summ. J. 16, ECF No. 68 ["CCME Br."].) CCME also argues that N.C.G.S. § 131E-265 expressly authorizes DHHS to receive the results of any criminal background check, mandates CCME to turn over all documents showing criminal history of a provider's employees, and states that all documents CCME receives from a provider are the property of DHHS. (CCME Br. 17.)

92.     CCME argues that it did not inflate the number of convicted felons employed by Halikierra during its communications with DHHS.  (CCME Br. 17.) Further, CCME contends that it did not falsify data to DHHS, but rather it accurately reported Halikierra's Medicaid billing passage rates and Halikierra simply misunderstands the method of calculation utilized by CCME.  (*See* CCME Br. 20–21.) Finally, CCME argues that complying with the statute and the prepayment review process is not inherently unfair or deceptive.  (CCME Br. 15.)

93.     Halikierra argues that the CCME Reports provided at Piggott's request on 18 and 28 September 2018 are record evidence that CCME falsified data.  According to Halikierra, in the time between the two reports, "CCME purports to have increased its findings [of claims of concern] from 12% of the claims submitted by Halikierra to 50% of the claims submitted by Halikierra."  (Pls.' Br. Opp. CCME 4.)  Halikierra argues that CCME then disavowed the two reports when Winters testified that they had "nothing whatsoever" to do with Halikierra's monthly passage rate.  (Pls.' Br. Opp. CCME. 6.)

94.     Halikierra contends that CCME's continuation of its investigation after referrals to the MID were rejected by the Attorney General's Office furthered Piggott and Cox's scheme to destroy Halikierra's business.  (Pls.' Br. Opp. CCME 8–10.)  The decision not to prosecute Halikierra, however, is immaterial to an investigation of whether there were sufficient grounds to place Halikierra on prepayment review.

95.     Finally, Halikierra argues that during phone conversations and in-person meetings between 24 July 2018 and 1 August 2018, CCME "advised [DHHS] that

Halikierra was employing a 'majority of felons.' " (Pls.' Br. Opp. CCME 13.) As evidence of this allegation, Halikierra cites an email sent by OCPI director John Thompson to his supervisor stating, "CCME . . . identified that the provider staffing pool consisted of a majority of felons including those providing PCS aide services." (Pls. Ex. 5, ECF No. 75.5 ["Thompson Email"].) This email, Halikierra contends, caused a search of its offices by DSHR and OCPI.

96. The record reveals no genuine issue of material fact regarding whether CCME acted in a manner that was unfair or deceptive. First, it is undisputed that the CCME Reports are distinct from the monthly passage rate reports and measured different aspects of Halikierra's Medicaid billing. Monthly passage rates are generated by calculating the number of line items in the Medicaid billing that Halikierra submitted for review during a given month and dividing that number into the number of successful claims for that same month. (Winters Dep. 170:4–170:12.) The result is a ratio stated as a percentage of accuracy for the month.

97. In contrast, for the CCME Reports, instead of calculating the number of line items, DHHS tasked CCME with totaling the dollar amount of claims that were subject to various concerns. These reports were generated for the specific purpose of providing supporting documentation for DHHS' referral of Halikierra to MID. (Winters Dep. 214:12–214:22.)

98. While the 13 September 2018 Preliminary Report was *preliminary*, the second report, provided by CCME to DHHS on 28 September 2018, was the Final Report and reflected an examination of all claims for the period. (Pls.' Ex. 16, 1, ECF

No. 75.16; Pls.' Ex. 18, 1, ECF No. 75.18 ["CCME Reports"].) The concerns examined in the CCME Reports included recipient safety concerns, document authenticity concerns, potential services not rendered, and eligibility of the staff employed. (*See* CCME Reports.)

99. Halikierra's argument that CCME falsified data in these reports ignores the fact that the first report was preliminary and reflected only what had been discovered to that point in time in an ongoing investigation. The final report delivered to DHHS on 28 September 2018 was more comprehensive, but it does not evidence data falsification.

100. Further, Halikierra's argument that Winters "disavowed" the CCME Reports is not supported by the evidence. Rather, the record demonstrates that the CCME Reports and the monthly passage rate reports used different timespans (the report period versus calendar months), different metrics (dollar amount of claims versus line items properly billed), and were prepared for different purposes (supporting MID referrals versus the statutory monthly reporting requirement). These differences do not support a contention that the CCME Reports contained falsified data.

101. There is also no evidence to support a contention that CCME inflated the numbers of felons working for Halikierra, or that CCME acted illegally or deceptively by providing DHHS with the background documentation supplied voluntarily by Halikierra. CCME was obligated by contract to report patient safety concerns to

DHHS, including the fact that some of Halikierra's employees had criminal records. (Winters Dep. 18:3–18:21, 20:1–20:2.)

102. The content of an email from John Thompson, the OCPI director, to his supervisor regarding the number of Halikierra employees with felony convictions, when viewed in context, is no more than one person's input and is not a misstatement properly attributed to CCME. (*See* Thompson Email.) The record demonstrates that, at the time this email was sent, DHHS, at its request, had been provided with only a sample of the criminal background checks of Halikierra employees with felony records. (Winters Dep. 145:20–148:6, 149:8–149:14.) Further, Winters, CCME's supervisor, never made a statement on CCME's behalf regarding the staffing pool consisting of a majority of felons. (Winters Dep. 116:16–117:2.) Without more, the probative value of the OCPI director's statement regarding the criminal background checks known to DHHS, even viewed in the light most favorable to Halikierra, is too strained to create a triable issue of fact as to any misrepresentation *by CCME*.

103. The record reflects that CCME took actions consistent with its contractual obligations as a third-party prepayment review vendor for DHHS. There is no evidence that CCME unfairly denied claims. In fact, Winters testified that CCME conducted monthly inter-rater reliability reviews to confirm that it maintained a 95% or higher accuracy rate and that it sent results to DHHS monthly. (Winters Dep. 205:21–206:7.)

104. CCME's accuracy in denying Halikierra's claims is further evidenced by the OAH decision upholding CCME's denial of Halikierra's billing claims. (OAH Final

Decision 8.) The OAH considered and found as fact that $982,789.50 worth of Halikierra's submitted Medicaid claims were properly denied, and DHHS "showed exemplar cases of the types of non-compliance with Clinical Coverage Policies at issue . . ." including:

> [b]illing for more hours than the aide service note documentation supported . . .; [a] nurse aide having a substantiated finding on the Nurse Aide Registry, which prevented the aide from providing PCS; [a] felony conviction that specifically prohibited the aide from providing PCS pursuant to Clinical Coverage Policy 3L, Section 6.0, Number 1; [a] nurse not licensed to perform a skill check on an aide; [a]n aide signing time sheets indicating that services were provided at more than one location at the same time . . . ; [a]ides billing for time traveled between beneficiaries . . . ; [a]n assessment dated February 16, 2019, but that was faxed by [Halikierra] and received by CCME on July 12, 2018; [c]ertificate of completion for required training dated December 20, 2018, but faxed by [Halikierra] and received by CCME on August 21, 2018; [and], [n]o staff records for an alleged employee.

(OAH Final Decision 6–7.)

105. Nothing in the record suggests that CCME, under contract with DHHS, had anything to do with the decision to inspect Halikierra's sites and review its compliance with licensure requirements. Rather, the record shows that DSHR began its investigation of Halikierra following a third-party complaint that Halikierra was operating from unlicensed sites, and that DSHR's investigation was separate from, and began prior to, OCPI's investigation. (Meyer Dep. 28:7–28:24.)

106. In sum, Halikierra has failed to establish the existence of a genuine issue of material fact regarding whether CCME acted in a way that was unfair or deceptive. Accordingly, the Court GRANTS the Motion as to the claim of unfair and deceptive trade practices brought by Halikierra against CCME.

## II. Against Piggott and Cox

107. "The consumer protection and antitrust laws of Chapter 75 of the General Statutes do not create a cause of action against the State, regardless of whether sovereign immunity may exist." *Sperry Corp. v. Patterson*, 73 N.C. App. 123, 125 (1985). "The State of North Carolina is not a 'person, firm, or corporation' within the meaning of G.S. § 75-16. . . ." *Id.* "When . . . defendants act in their official capacity, it is the State acting." *Id.* (quoting *Microfilm Corp. v. Turner*, 7 N.C. App. 258, 263, *cert. denied*, 276 N.C. 497 (1970)). Individuals acting as representatives of the State when dealing with a plaintiff are not subject to N.C.G.S. § 75-1.1. *Id.*

108. The evidence in the record, viewed in the light most favorable to the nonmovant, indicates that Piggott and Cox interacted with Halikierra only in their official capacity as representatives of the State. Because Piggott and Cox interacted with Halikierra in their official capacity as employees of OCPI and no evidence in the record indicates otherwise, their action is the same as the State action, and they are therefore not subject to N.C.G.S. § 75-1.1. *See Sperry Corp. v. Patterson*, 73 N.C. App. 123, 125 (1985).

109. Accordingly, the Court determines it does not have subject matter jurisdiction over this claim. While not briefed as a basis for the Motion, the Court dismisses the unfair and deceptive trade practice claims against Piggott and Cox *sua sponte* for lack of subject matter jurisdiction pursuant to Rule 12(h)(3). N.C.G.S. § 1A-1, Rule 12(h)(3) ("Whenever it appears by suggestion of the parties or otherwise that the court lacks jurisdiction of the subject matter, the court shall

dismiss the action."); *Catawba Cty. v. Loggins,* 370 N.C. 83, 100 (2017) (Martin, J., concurring) ("A court can, of course, dismiss a case *sua sponte* for lack of subject-matter jurisdiction."). As a result, the Court does not reach Defendants Cox and Piggott's Motion for Summary Judgment and denies that motion as moot.

C.  **Civil Conspiracy Claims Against CCME, Cox, and Piggott**

110. Civil conspiracy requires that: (1) two or more persons agreed to do a wrongful act; (2) those persons committed an overt act in furtherance of the agreement; and (3) the plaintiff was harmed as a result. *Pleasant Valley Promenade v. Lechmere, Inc.,* 120 N.C. App. 650, 657 (1995). Civil conspiracy is not an independent cause of action in North Carolina; it requires an underlying claim for unlawful conduct. *Toomer v. Garrett,* 155 N.C. App. 462, 483 (2002) (citations omitted).

111. Because there are no viable underlying claims as to CCME, Cox, or Piggott that would support a claim of civil conspiracy against them, the Court GRANTS the Motions as to the claims of civil conspiracy against CCME, Cox, and Piggott.

## VI.  CONCLUSION

112. In summary, the record before the Court fails to create a genuine issue of material fact that DHHS acted arbitrarily or capriciously to violate Halikierra's substantive due process and equal protection rights under the North Carolina Constitution. The record does not support a claim that CCME, in its capacity as a contractor for DHHS, engaged in an unfair or deceptive practice. As a matter of law, the Court does not have subject matter jurisdiction over UDTPA claims against

Piggott and Cox. Absent a viable underlying claim, there can be no civil conspiracy between CCME, Piggott, and Cox.

113. Therefore, Defendants' Motions for Summary Judgment is GRANTED with prejudice with respect to Halikierra's constitutional claims against DHHS, the Unfair and Deceptive Trade Practices Act claim against CCME, and the civil conspiracy claim against CCME, Piggott and Cox. The Court DISMISSES *sua sponte* without prejudice the Unfair and Deceptive Trade Practices Act claim against Piggott and Cox. Accordingly, the Motion for Summary Judgment regarding the Unfair and Deceptive Trade Practices Act claim against Piggott and Cox is DENIED as MOOT.[9]

IT IS SO ORDERED, this the 27th day of September, 2022.

/s/ Michael L. Robinson

Michael L. Robinson
Special Superior Court Judge
  for Complex Business Cases

---

[9] To the extent the Court is wrong in its determination that it lacks subject matter jurisdiction of this claim against Piggott and Cox, the Court alternatively concludes that summary judgment is properly entered against Plaintiff with regard to this claim because of a total lack of evidence in the record that those Defendants were acting outside the course and scope of their employment at the times and in the manners alleged.